MAINZ, by Guardian *ad litem,* and another, Appellants, v. LUND and another, Respondents.

*January 7—February 5, 1963.*

634

For the appellants there were briefs by *Engelhard, Snodgrass & Goerdt,* and oral argument by *Daniel T. Flaherty* and *Charles N. Goerdt,* all of La Crosse.

For the respondents there was a brief by *Bosshard, Arneson & Sundet,* and oral argument by *Philip G. Arneson* and *Patrick R. Doyle,* all of La Crosse.

CURRIE, J.   The issues presented on this appeal are:

(1) Was defendant Lund causally negligent as a matter of law?

(2) Did the trial court commit prejudicial error in its instructions to the jury?

(3) Should a new trial be granted in the interest of justice?

## Negligence Issue.

Defendant Lund at the time of the accident was twenty-six years of age and employed as a manufacturing engineer by the Trane Company at its La Crosse plant. He left the Trane Company plant on the day of the accident at about 4:45 p. m. and got into his 1956 four-door Oldsmobile sedan to drive home. He had with him three fellow employees, Miller, Liverzani, and Demco. It was growing dark and Lund drove with his headlights on low beam. He testified that these lights gave him visibility for a distance of 90 feet ahead of his car. There was no fog or haze, the weather was clear, and the pavement was dry. Lund's route led onto Losey boulevard three or four blocks south of the point of accident. He stated that he maintained a constant speed which he estimated to have been 20 to 25 miles per hour although he did not look at his speedometer. The applicable speed limit was 25 miles per hour. He was traveling in the right-hand lane of the two northbound traffic lanes.

We will first consider Lund's negligence as to lookout. He testified that as he approached the intersection with Green Bay street, he made an observation to his left but did not turn his head in doing so. At the intersection he saw the approaching lights of a group of southbound cars a block or two ahead on Losey boulevard. The traffic lights on Losey boulevard at the intersection two blocks north of the Green Bay street intersection had apparently changed shortly before so as to permit southbound traffic to proceed. Lund was asked this question and gave this answer:

"*Q.* With respect to the headlights that were coming toward you will you state whether and just what, if any, effect they had upon your vision? *A.* The dark portions of the cars between the headlights and of the car body itself created

a shadowy and dark portion at the approximate height of the headlights so that there were dark and light spaces."

Lund did not see the children standing on the concrete island prior to the accident. He testified that when about halfway through the intersection he saw a blur proceeding from left to right. This blur was Lois Mainz darting across the northbound lanes of Losey boulevard. Lund immediately applied his brakes as hard as he could. He stated that when his car struck Lois she was carried along on the hood until the car stopped when she continued to roll along the pavement. The only damage to Lund's car was a small dent in the front of the hood on the left side.

Neither the car nor the child was moved after the accident until the police arrived and took various measurements. As a result of Lund's applying his brakes hard, double skid marks extended back 56 feet, two inches from the rear bumper of his car. The south ends of these skid marks were about at the extended north curbline of the intersection. The distance between the north and south curblines of the intersection is 50 feet. Lund's car was 16 feet, 10 inches long and Lois lay a distance of 25 feet, six inches ahead of the car. Her head was 15 feet, seven inches and the car was eight feet, six inches from the east curbline. The northbound lanes on Losey boulevard are 29 feet wide. Based on Lund's testimony the point of impact occurred approximately 31 feet north of the north curbline of the intersection. Thus Lund's car skidded 25 feet after striking Lois. Therefore, she was thrown and rolled by the force of the impact a distance of approximately 67 feet.

The evidence concerning lighting at the intersection at the time of the accident is not too satisfactory. Nevertheless, there is testimony that the filling station at the northeast corner of the intersection and the shopping center to the immediate north of the filling station were well lighted at

the time. Light from these sources should have helped to light the intersection.

If this accident had occurred in broad daylight and not at dusk, we would have no hesitancy in holding Lund negligent as a matter of law for not having seen the four children on the concrete island. Of course had he seen these small children, it would have been his duty to so manage and control his car that he could avoid an accident if one of the children started to cross the street. Cf. *Lisowski v. Milwaukee Automobile Mut. Ins. Co.* (1962), 17 Wis. (2d) 499, 117 N. W. (2d) 666. We find no basis, however, for finding Lund negligent with respect to management and control because of his testimony that he applied his brakes as hard as he could as soon as he saw the child.

Even with the dusk conditions that prevailed here, Lund ordinarily should have been able to see the children on the island within the range of his headlights. The only mitigating circumstance is the possible obscuring effect of the headlights of the oncoming cars on Lund's vision. The sole testimony with respect to this effect is Lund's answer quoted above to the question which raised this issue. Even then the lights of these oncoming cars were moving and it is difficult to understand why the bodies of the children should not have been temporarily silhouetted or outlined because they stood in Lund's direct line of vision toward these oncoming lights.

One witness, an executive of the Trane Company named Pearse, who just prior to the accident had been driving directly behind Lund's car, testified that he first saw a group of children standing on the island in question when he was a little to the south of the south crosswalk line of the intersection. Lund's passenger, Liverzani, who was seated in the right rear seat, testified that he was putting on his gloves at the time of the accident and "didn't see anything on the highway." Nevertheless, Liverzani did not testify that he

made any observation in the direction of the island where the children were standing. Thus we deem his testimony of no probative value as to whether the children were visible to a driver in Lund's position. The defendants had made arrangements for Demco, the other rear-seat passenger, to come from out of town to testify. Nevertheless, his train was late and he did not arrive before the trial closed; thus counsel stipulated that he would have testified to the same facts as did Liverzani. Miller, the front-seat passenger, resided in Utah at the time of trial and did not testify. Another witness, a Trane Company employment manager named Farnam, had driven through the intersection prior to the accident, stopped his car at a filling station two blocks to the north, and gotten out of his car when he heard the sound of squealing of tires on pavement. It is assumed that this sound was produced by Lund's car when the brakes were applied. Farnam testified that he saw no children on the island when he passed through the Green Bay street intersection shortly before Lund. We also deem Farnam's testimony of slight if any probative value because of the probability that the children arrived at the island after he had passed it.

While the issue is extremely close, we conclude that under the prevailing conditions of dusk and of moving lights of oncoming cars in the southbound lanes, the issue of whether Lund was negligent with respect to lookout presented a jury question which cannot now be resolved as a matter of law.

There is considerable discussion in the briefs as to whether the concrete island, upon which the children were standing prior to the accident, is a "safety island" within the meaning of sec. 349.10 (1) (b), Stats. For the purposes of this case we deem it entirely immaterial whether or not this island was a "safety island" within the meaning of this statute. This is because Lois Mainz was of such tender age that she was incapable of contributory negligence (sec. 328.44), and

the island was located in a place where Lund was required to direct his lookout.

We will next consider Lund's negligence with respect to speed. The prevailing conditions of dusk and of moving lights of oncoming cars in the southbound lanes did not suddenly interfere with Lund's vision, but were present as Lund proceeded north on Losey boulevard for three or four blocks prior to the accident. Therefore, if these conditions interfered with his vision, he was required in the exercise of due care to travel at a reduced speed appropriate to such conditions. Sec. 346.57 (2) and (3), Stats.[1] In *Dahl v. Harwood* (1953), 263 Wis. 1, 56 N. W. (2d) 557, we held that a driver who proceeds at a speed of 45 miles per hour in a 50-mile-per-hour zone may be found negligent as to speed when driving in dusk conditions similar to those present in the instant case. Nevertheless, it is impossible to lay down as a rule of law that Lund was required to drive at any particular speed under 25 miles per hour.

There is evidence in the case that strongly suggests that immediately prior to the accident, Lund was driving at a speed in excess of 25 miles per hour. The trial court properly admitted the table of average stopping distances of vehicles operated at various speeds under normal driving conditions

---

[1] Sub. (2) of sec. 346.57 provides in part:

"No person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard for the actual and potential hazards then existing."

Sub. (3) of this same section provides:

"The operator of every vehicle shall, consistent with the requirements of sub. (2), drive at an appropriate reduced speed when approaching and crossing an intersection or railway grade crossing, when approaching and going around a curve, when approaching a hillcrest, when traveling upon any narrow or winding roadway, when passing school children, highway construction or maintenance workers or other pedestrians, and when special hazard exists with regard to other traffic or by reason of weather or highway conditions."

on dry, level pavement as set forth in Wisconsin's Manual for Motorists (rev. ed. October, 1955) issued by the motor vehicle department. *Steffes v. Farmers Mut. Automobile Ins. Co.* (1959), 7 Wis. (2d) 321, 331, 96 N. W. (2d) 501.[2] This table shows a total stopping distance at 20 miles per hour of 44 feet of which the first 22 feet are for reaction time, and at 30 miles per hour of 83 feet of which the first 33 feet are for reaction time. Thus, according to this table, at a speed of 30 miles per hour, 50 feet would be required to stop after a lapse of the 33 feet of reaction time. Here the skid marks 56 feet, two inches long suggest a speed slightly in excess of 30 miles per hour rather than that of 20 to 25 miles per hour as testified to by Lund.

Nevertheless, it is common knowledge that some other factors which affect stopping distances are the relative size and working condition of the brakes and the weight of the car including passengers.

There was also testimony, which was disputed, as to the presence of another factor which might have affected Lund's stopping distance, namely sand on the concrete pavement. We are satisfied from the photographs of the area taken immediately after the accident before Lund's car had been moved, and introduced into evidence on trial, that if sand was present it was slight in amount. The police photographer who took these photographs testified that if sand were present on the pavement it would be visible in the photographs.

---

[2] The reference to Wisconsin's Manual for Motorists in the *Steffes Case* was to the edition last revised in October, 1955. A conference with officials of the motor vehicle department indicates that the stopping distances suggested on page 22 of that edition were based upon tests conducted by the National Automobile Manufacturers' Association with expert drivers driving automobiles on test courses. A later edition of Wisconsin's Manual for Motorists, last revised in April, 1962, includes on page 36 a chart of suggested stopping distances which are based upon results of 5,000 tests by ordinary drivers using their own cars.

There was no testimony as to what effect on braking distance sand on the pavement would have. To the extent that any sand present would have adversely affected Lund's ability to stop, it would have been further reason for driving at a reduced speed under the circumstances.

While the great weight of the evidence tends to establish negligent speed on Lund's part, we nevertheless are compelled to conclude that his speed was an issue for the jury to determine because where there is any credible evidence, as here, to sustain the jury's answer to a question of the special verdict, this court has no power to change such answer. *Braatz v. Continental Casualty Co.* (1956), 272 Wis. 479, 482–484, 76 N. W. (2d) 303.

### The Instructions.

The United States weather bureau's report for December 3, 1959, was introduced into evidence as Exhibit 13. It showed that sunset occurred on that day at La Crosse at 4:28 p. m. Sec. 340.01 (23), Stats., defines "hours of darkness" as "the period of time from one-half hour after sunset to one-half hour before sunrise and all other times when there is not sufficient natural light to render clearly visible any person or vehicle upon a highway at a distance of 500 feet." The accident was reported over the phone to the La Crosse police department at 4:55 p. m., thus establishing as a verity that the accident did occur prior to 4:58 p. m., which was one-half hour after sunset on the day of the accident. The trial court included the following in its instructions to the jury:

"There is a conflict as to the precise time at which the accident occurred. It appears from the evidence that it happened sometime between 4:50 and 5 p. m. on December 3, 1959. It will be for you, the jury, to determine, based on all the evidence, the precise time of the accident. In this connection Exhibit 13 was introduced and received into

evidence which is a certified copy of the weather bureau information pertaining to December 3, 1959, and Exhibit 13 sets forth the time of sunset on that day. In this connection you are instructed that a statute of the state of Wisconsin provides:

" 'Hours of darkness' means the period of time from one-half hour after sunset to one-half hour before sunrise and all other times when there is not sufficient natural light to render clearly visible any person or vehicle upon a highway at a distance of 500 feet."

Plaintiffs complain that this instruction with its inaccurate statement, that the evidence disclosed that the accident could have happened as late as 5 p. m., misled the jury as to the degree of darkness that prevailed at the time of the accident. The testimony was in sharp conflict as to such degree of darkness. One witness stated that at the time of the accident he was driving without any lights on and could see clearly. Lund at one point testified that it was dark enough for parking lights. Nevertheless, it is undisputed that most cars were driving with headlights on. We do not believe that the jury was misled by the inaccurate statement in the instruction quoted above, and we hold that it was not prejudicial because, by the greater weight of the evidence, a driver in Lund's situation at the time of the accident could not see 500 feet ahead because of dusk conditions.

### New Trial in the Interests of Justice.

As a result of reading the record in this case, we have a strong feeling that the verdict returned resulted in a miscarriage of justice. Not only is the result absolving Lund of any negligence against the great weight of the evidence, but the $15,000 damages awarded for Lois Mainz's personal injuries are extremely low considering their severity.

Lois did not completely regain consciousness until nineteen days after the accident. She suffered a severe cerebral concus-

sion and contusions, fractures of the right humerus, right shoulder, and right lower leg. She sustained a severe emotional disturbance which was still present at the time of trial. Dr. Suckle testified that in his opinion this disturbance would be permanent. To alleviate this emotional disturbance, Dr. Suckle recommended that the parents move to a quieter neighborhood. Lois' parents acted on his advice and moved from the city to a rural area but this did not help. The most serious injury, however, was the severe brain damage which caused the emotional upset and ataxia or spasticity in her left arm. Dr. Gallagher testified that she could not hold a glass of water in her left hand without causing the water to spill; this was demonstrated to the jury. There was testimony that Lois cannot hold food in her left hand and has difficulty buttoning her clothes. Both Dr. Suckle and Dr. Gallagher testified that the ataxia was permanent. With respect to the emotional upset, Dr. Suckle testified Lois might "compensate" for it when she reached her twenties.

The awarding of inadequate damages is not in itself grounds for ordering a new trial where a jury has answered other questions in the verdict so as to find no liability on the part of the party charged with negligence. Cf. *Sell v. Milwaukee Automobile Ins. Co.* (1962), 17 Wis. (2d) 510, 519, 520, 117 N. W. (2d) 719. Nevertheless, when the finding of no liability is against the great weight of the evidence, the added element of inadequate damages may have significance in determining whether a new trial should be ordered in the interest of justice.

Both the learned trial court in its memorandum opinion, and defendants' counsel on this appeal, stress Lund's impaired visibility due to the conditions of dusk and of the headlights of approaching automobiles in the southbound lanes. Nevertheless, this very evidence, together with the 56-foot skid marks, comes very close to establishing negligence on Lund's

part with respect to speed as a matter of law. If visibility was so poor that Lund could not see the children until one actually invaded the northbound lanes, and he was unable to stop his car without striking such child, then he was driving too fast for the conditions then prevailing.

In view of our strong feeling that a miscarriage of justice would result if the verdict were permitted to stand, we exercise our discretion under sec. 251.09, Stats., to order a new trial in the interest of justice.

*By the Court.*—Judgment reversed, and cause remanded for a new trial on all issues.