28 Wis.2d 552 (1965)
METCALF, by Guardian ad litem, and another, Appellants,
v.
CONSOLIDATED BADGER CO-OPERATIVE, Respondent.[*]
Supreme Court of Wisconsin.
October 6, 1965.
November 2, 1965.
*556 For the appellants there was a brief and oral argument by Michael Burns of Seymour.
For the respondent there was a brief by Joyce & Goggin of Neenah, and oral argument by Daniel R. Goggin.
WILKIE, J.
Seven separate issues, some more important than others, are involved on this appeal. They are:
1. Is there credible evidence to support the jury's finding of negligence as against Stephen?
2. Is there credible evidence to support the jury's apportionment of 70 percent of the causal negligence to Stephen?
3. Did the trial court commit prejudicial error in its instructions concerning the difference in the standard of care owed by the minor plaintiff and the defendant?
*557 4. Was the award of damages so grossly inadequate as to be the result of passion, prejudice, and perversity?
5. Was prejudicial error committed in allowing alleged improper remarks made by respondent's counsel?
6. Was it error for the trial court to refuse to submit the case to the jury on a safe-place theory?
7. Was it error for the trial court to refuse to permit inquiry on voir dire into jurors' interest in the Travelers Insurance Company, the carrier of liability insurance for the defendant?
We will consider these issues in the order stated.

Negligence of Minor.
Appellants contend that Stephen was free of negligence. Clearly there is evidence to sustain the jury's verdict that Stephen was negligent in a qualitative sense when he played on the power conveyor. There was testimony that Stephen had played on the conveyor two or three days before the accident (though the conveyor chain was not running at the time); that Mr. Tierney, the manager, had told him "to get off the conveyor;" that on the same day Stephen's mother had warned him not to play on the conveyor; that on the day of the accident Stephen and his companion played on the conveyor and rollers for ten minutes prior to the accident, climbing up the rollers and riding on the conveyor.
Appellants' basic argument is that a child as young as Stephen was incapable of negligence due to his age (seven years, three months, and ten days). The legislature has given attention to this question and has determined that a child who has not yet reached the age of seven is incapable of negligence.[1] Once he is seven he is capable of negligence though by a lesser standard of care than an adult. It is not for the *558 court to tamper with the legislature's determination that a child of seven can be negligent.

Apportionment of Negligence.
Appellants contend that the Badger Co-operative was guilty of greater causal negligence than was Stephen. We are satisfied that there was evidence of negligence on the part of both the boy and the defendant and that the apportionment of negligence between the two was properly a question of fact to be answered by the jury.[2]
In apportioning negligence between an adult and a child the jury has to take into consideration the child's age, capacity, discretion, knowledge, and experience.[3] Appellants argue that Stephen acted the way any seven-year-old would have under the circumstances, and that the milk plant was guilty of greater negligence, pointing to (1) Stephen's playmate's (also age seven) actions, (2) knowledge on the part of the plant manager that children played on the premises, and (3) general knowledge in the business that children play on the dead rollers and conveyors as evidenced by testimony of other plant operators and warnings in dairy journals.
Apparently the jury, based on Stephen's conduct just prior to the accident, his prior familiarity with the conveyor, the prior warnings given to him to get off the conveyor, concluded that Stephen should have been aware of the dangers inherent in machinery of the type involved here and that he should have taken steps to protect himself and to avoid the accident.
*559 In view of the evidence we concur with the trial court, in its decision on motions after verdict, where it stated:
"On the question of comparative negligence it is felt that a typical issue of fact was presented. . . . The jury could believe, on credible evidence, that the boy was of such age and experience that he knew the hazards which faced him and, in the face of them, gambled for his own pleasure and entertainment. . . ."

Instructions on Comparative Negligence.
Appellants contend that the trial court committed prejudicial error in instructing the jury on the difference in the rule of negligence that applies to the defendant and to the minor plaintiff both in determining negligence, if any, on the part of Stephen and in comparing Stephen's negligence with that of the defendant.
The trial court's entire instruction on the question in the verdict concerning Stephen's negligence was as follows:
"Question No. 3 of the verdict inquires whether Stephen Metcalf was negligent with respect to his own safety. He had a duty to exercise care for his own safety. The care which he was required to use depended upon his age, his capacity, his discretion and knowledge and experience. Negligence on the part of a child is failure to exercise that degree of care which is ordinarily exercised by a child of the same age and capacity and discretion and knowledge and experience under the same or similar circumstances. In determining whether Stephen Metcalf was exercising that care that one of his age, capacity, discretion, knowledge and experience would exercise under the same or similar circumstances due consideration should be given to the child's instinct and impulses; for, while the child may have the knowledge of an adult respecting dangerou[s] acts, he may not have the prudence, or discretion or thoughtfulness to avoid hazards of risk to which he is exposed. It is for you to determine *560 from all of the evidence, weighing it and considering it, what your answer to this question should be."
On the comparison of negligence the trial court instructed:
"In determining your answer to the comparative negligence question you may bear in mind the difference in the rule of negligence that applies to the defendant and the plaintiff minor boy, and determine this question, No. 5, in the light of the difference in these rules which apply to these parties." (Emphasis added.)
Appellants contend the latter instruction was erroneous because the court used the word "may" rather than "should." Appellants did not properly preserve this alleged error for appeal. Appellants did not propose an instruction on comparative negligence, object to the instruction given, or allege that the instruction was erroneous in their motions after verdict. Consequently, appellants cannot now, as a matter of right, avail themselves of this alleged error as a basis for reversal.[4] Nevertheless, in our discretion, we proceed to a consideration of this contention on its merits. The trial court should have instructed the jury that, in making its comparison of negligence, it "should" rather than "may" bear in mind the difference between child and adult negligence.[5] Nevertheless, viewing the instructions as a whole,[6] their net effect was to advise the jurors that they were continually to take account of Stephen's age whenever they considered his actions, on the question of comparison in negligence as well as on the question of his causal negligence. Therefore, *561 there was no reversible error committed by the trial court in this regard.

Damage Awards Not Grossly Inadequate.
Appellants contend that the award of damages was grossly inadequate and the result of passion, prejudice, and perversity. The $1,000 awarded for personal injuries and "none" awarded for future medical expenses form the basis of this contention.
The standard for this court's review of damages is that where there is any credible evidence which under any reasonable view supports the jury finding, especially when the verdict has the approval of the trial court, it should not be disturbed.[7]
The testimony shows that immediately after the accident Stephen was operated upon to connect the severed tendon and a skin graft was necessary to cover the wound. A piece of the severed tendon was missing so the tendon operation involved splitting the upper portion of the tendon so that it could be reversed and connected with the bottom piece of tendon. As a result of this operation the tendon is half its normal thickness at the injured area. This portion of the operation was considered very successful. The skin graft involved taking a full-thickness flap of skin from the buttocks and attaching it at the injured area.
After both procedures were completed, Stephen's ankle was placed in a cast which he wore for about five weeks. When the cast was removed it was necessary for a second skin graft. Stephen was sent to Madison for this purpose. The operation there involved removing the prior skin graft *562 and replacing it with a split-thickness skin graft from his left thigh. The operation was successful but the skin at the back of his ankle is not full thickness and his ankle does not have the fatty protection the normal ankle does.
Stephen testified that he could participate in sports, that he played normally with other children, and that his ankle was getting stronger all the time. He said that ulceration developed when he wore high shoes because they rubbed the injured area. He remedied this by wearing low shoes.
Two doctors testified respecting the prognosis of Stephen's injury. With regard to the tendon, Dr. Raymond C. Groendahl's testimony, on direct examination, was:
"Q. Now as to Stephen's Achilles' tendon at the present time, of the right extremity, can it be described as a normal tendon? A. No. It is an abnormal tendon because it would only be about half of the diameter that it was prior to surgery.
"Q. Is it true, doctor, that a normal tendon is designed to accommodate and cope with normal stresses and strains? A. I think so.
"Q. Does it follow that an abnormal tendon, half the normal size, is less strong and less durable than a normal tendon? A. I would believe there would be a loss of tensile strength, yes."
On cross-examination:
"Q. As far as your operation on the tendon, that was a successful operation, wasn't it? A. I believe so.
"Q. And the results were good, isn't that correct? A. The results were good."
On redirect:
"Q. Doctor, there is a well-healed result from the suturing of the tendon, isn't that correct? A. Yes, I believe so.
"Q. The results are as good as could be expected? A. Yes.
"Q. But we do have a tendon that has less thickness than normal, and, accordingly, is less durable than a normal tendon? A. I would say it had less strength than normal."
*563 Dr. Frank Bernard, the plastic surgeon who performed the second skin graft, testified concerning future medical expenses as follows:
"Q. Is there any probability of future medical attention being required? A. I would say, within reason, if the area is quite well protected, by limiting his activities, he might get by without any further attention. If not he will require further attention.
"Q. Do you have an opinion, doctor, to a reasonable degree of medical certainty, and based on your having had Stephen under your care, and being familiar with his condition since the time you saw him in March, 1960, do you have an opinion to a reasonable degree of medical certainty as to whether the boy will require future medical attention? A. I do.
"Q. Will you state what your opinion is as to that? A. I would feel that, based on past history since the graft has been placed on his heel, and knowing that on several occasions ulceration has occurredbased on these facts I would assume, as far as the future is concerned, that perhaps repeated ulceration might occur. This would require medical attention."
On cross-examination:
"Q. All this testimony as to possible future medical expenses, as you say, may be fifteen to thirty years from now? A. That is correct.
"Q. That is purely speculative, isn't it? A. No, sir. I believe that if the area is protected that he may well have no trouble. However, even with protection it still may break down.
"Q. You are in the realm now of possibilities, aren't you? A. The difference between a possibility and probability, of course, arises. I would like to state that
"Q. I would like to have you answer my question. A. You want me to answer yes or noprobability?
"Q. Possibilities? A. I would say yes, possibility.
"Q. Now, doctor, as a matter of fact from the sites where the skin was removed for the skin graft there is no resulting disability there, is there? A. None other than the scar."
*564 Given the foregoing testimony the jury could have concluded that future medical expenses were not probable, so there is testimony to sustain the "none" award for future medical expenses.[8] One thousand dollars does not seem like very much for personal injury but the jury could have concluded from the testimony that there is no permanent injury and that $1,000 reasonably compensated Stephen for his pain, suffering, and so on.
Appellants urge that the low damages awarded, taken in combination with the apportionment of negligence against Stephen, bring the case within Mainz v. Lund.[9] The injured girl in the Mainz Case was four and one-half years old when she was struck by defendant's auto so only the defendant's negligence and her injuries were in issue. The jury found the driver not negligent. Upon reviewing the physical facts, including skid marks, the court concluded that "the great weight of the evidence tends to establish negligent speed on Lund's part,"[10] but that there was credible evidence to sustain the jury verdict so the court could not change the answer.
As to damages, the young girl was awarded $16,000 but received severe permanent damages, including brain damage which caused emotional problems and spasticity in her left arm. The girl was unconscious for nineteen days, received multiple fractures and other injuries. The court said:
"The awarding of inadequate damages is not in itself grounds for ordering a new trial where a jury has answered other questions in the verdict so as to find no liability on the part of the party charged with negligence. Cf. Sell v. Milwaukee *565 Automobile Ins. Co. (1962), 17 Wis. (2d) 510, 519, 520, 117 N. W. (2d) 719. Nevertheless, when the finding of no liability is against the great weight of the evidence, the added element of inadequate damages may have significance in determining whether a new trial should be ordered in the interest of justice."[11]
The court further said:
"As a result of reading the record in this case, we have a strong feeling that the verdict returned resulted in a miscarriage of justice."[12]
Consequently, a new trial was ordered under sec. 251.09, Stats., in the interest of justice.
The instant case is not governed by Mainz v. Lund. In Mainz, no negligence was found against the defendant driver whereas here the defendant was found 30 percent negligent. In Mainz, the damages were shockingly low in the face of medical testimony that the injuries were severe and left many serious permanent residuals.
Although we agree with the trial court here that "the damages are small," we also concur that "they are not sufficiently inadequate to call for the court's interference, . . ."
Moreover, although the result of the jury's comparison of the causal negligence is to free the defendant of any liability, as stated in Sell v. Milwaukee Automobile Ins. Co.:[13]
"The rule is that where a jury has answered other questions so as to determine that there is no liability on the part of the defendant, which finding is supported by credible evidence, the denial of damages or granting of inadequate damages to the plaintiff does not necessarily show prejudice or render the verdict perverse."

*566 Improper Arguments.

Appellants did not object to, or make a timely motion for mistrial based on the alleged improper remarks made by respondent in oral argument, so we cannot now consider whether such remarks were improper and, if improper, were prejudicial.[14]

Was Not Safe-Place Case.
Appellants contend that it was error for the trial judge to refuse to submit the case to the jury on a safe-place theory as well as an attractive-nuisance theory. This would permit the jury to decide whether Stephen was a trespasser or a frequenter and then proceed on the appropriate theory. A frequenter is defined in sec. 101.01 (5), Stats.:
"The term `frequenter' shall mean and include every person, other than an employe, who may go in or be in a place of employment or public building under circumstances which render him other than a trespasser."
Even assuming the children were not trespassers upon the premises generally, there was no jury question as to their being trespassers with respect to the conveyor, so the judge properly concluded that the safe-place statute did not apply to Stephen.

Questioning During Voir Dire.
Appellants contend that the court erred by refusing to permit inquiry on voir dire into jurors' interest in the Travelers Insurance Company. There was no error in this refusal. The insurance company was not a party so ordinary *567 policyholders or shareholders would not know of any interest they might have in the case. Names of officers and directors can be obtained in the office of the commissioner of insurance. An inquiry into the occupations and places of employment of jurors would have disclosed whether any were agents or employees of the insurance company in question. Given these factors, and in the absence of any good-faith showing that appellants had good reason to believe a member of the panel had a financial interest in the insurance company that might disqualify him, it would have been improper to interject insurance into the case during the voir dire.[15]
By the Court.Judgment affirmed.
HEFFERNAN, J. (dissenting).
I would reverse in the interests of justice pursuant to the discretionary power granted to this court by sec. 251.09, Stats. Two factors combine to lead me to this conclusion. In the first place, the damages for personal injuries that were awarded to this child were acknowledged by the trial judge to be small. I believe them to be so low as to be indicative of possible prejudice or perversity. While under the ordinary circumstance, this would be a matter that I would leave strictly to the jury, in this case these low damages are coupled with an inadequate instruction in regard to comparative negligence.
My brethren agree that the court's instruction that the jurors "may" bear in mind the difference in the standards required of a child as contrasted to an adult was erroneous. The instruction ought to have positively stated that the jury should bear in mind those differences. Nonetheless, the majority concludes that these instructions, though erroneous, were not prejudicial.
*568 I would agree if there had not been evidence of prejudice in the award of damages. Bearing in mind the combination of these circumstances: The extremely low verdict and an erroneous instruction, it is my opinion that justice has not been done, that issues were not properly considered by the jurors, and I would, therefore, reverse in the interests of justice, with the direction that a new trial be ordered.
I am authorized to state that Mr. Justice BEILFUSS joins in this dissent.
NOTES
[*] Motion for rehearing denied, with costs, on January 4, 1966.
[1] Sec. 328.44, Stats.
[2] Granger v. Mutual Service Casualty Ins. Co. (1963), 19 Wis. (2d) 302, 120 N. W. (2d) 140; Davis v. Skille (1961), 12 Wis. (2d) 482, 107 N. W. (2d) 458; Kraskey v. Johnson (1954), 266 Wis. 201, 63 N. W. (2d) 112.
[3] Rossow v. Lathrop (1963), 20 Wis. (2d) 658, 663, 123 N. W. (2d) 523.
[4] Wells v. Dairyland Mut. Ins. Co. (1957), 274 Wis. 505, 80 N. W. (2d) 380.
[5] Blahnik v. Dax (1963), 22 Wis. (2d) 67, 76, 125 N. W. (2d) 364. Wis J ICivil, Part II, 1582.
[6] Willenkamp v. Keeshin Transport System, Inc. (1964), 23 Wis. (2d) 523, 127 N. W. (2d) 804; Zweifel v. Milwaukee Automobile Mut. Ins. Co., ante, p. 249, 137 N. W. (2d) 6.
[7] Springen v. Ager Plumbing & Heating, Inc. (1963), 19 Wis. (2d) 487, 120 N. W. (2d) 692; Erdmann v. Milwaukee Automobile Mut. Ins. Co. (1963), 20 Wis. (2d) 439, 122 N. W. (2d) 430. See also 16 A. L. R. (2d) 3.
[8] Michalski v. Wagner (1960), 9 Wis. (2d) 22, 100 N. W. (2d) 354; Baier v. Farmers Mut. Ins. Co. (1961), 15 Wis. (2d) 111, 112 N. W. (2d) 197; Bleyer v. Gross (1963), 19 Wis. (2d) 305, 120 N. W. (2d) 156.
[9] (1963), 18 Wis. (2d) 633, 119 N. W. (2d) 334.
[10] Id. at page 643.
[11] Id. at page 645.
[12] Id. at page 644.
[13] (1962), 17 Wis. (2d) 510, 519, 117 N. W. (2d) 719, and cases cited therein.
[14] Kink v. Combs, ante, p. 65, 135 N. W. (2d) 789; Zweifel v. Milwaukee Automobile Mut. Ins. Co. ante, p. 249, 137 N. W. (2d) 6.
[15] Filipiak v. Plombon (1962), 15 Wis. (2d) 484, 113 N. W. (2d) 365; also Mixis v. Wisconsin Public Service Co. (1965), 26 Wis. (2d) 488, 132 N. W. (2d) 769.