NOLDEN, Respondent, v. MUTUAL BENEFIT LIFE INSURANCE COMPANY, Appellant.

*No. 75–636. Submitted on briefs October 5, 1977.—*
*Decided November 1, 1977.*
(Also reported in 259 N. W. 2d 75.)

354

For the appellant the cause was submitted on the briefs of *Cross & Wagner* of Baraboo.

For the respondent the cause was submitted on the brief of *Hill, Quale, Hartmann, Bohl & Evenson* of Baraboo.

CONNOR T. HANSEN, J. The defendant issued Nolden a group health and life insurance contract based upon an application executed by Nolden on August 15, 1971. The contract provided for payment of medical expenses and $10,000 in death benefits. The insured died February 11, 1972, at the age of twenty-six, following open-heart surgery. The defendant contends that the deceased insured made erroneous or inaccurate statements as to his health condition in his application for insurance which increased the risk or contributed to the loss as a matter of law; that the trial court erred in not directing a verdict; and that we should therefore reverse the judgment.

An issue is also raised as to whether Russell Greenwood was an agent of the defendant, and whether because of Greenwood's knowledge of the insured's medical history, the defendant has waived its right to avoid the policy, or is estopped from doing so because of such knowledge by Greenwood.

The plaintiff's motion of review requires consideration of the trial court's determination in regard to certain medical expenses. This issue involved additional medical expenses in the amount of $7,572. Medical claims of this amount were not timely filed against the decedent's estate. The trial court held that the estate was not "legally required" to pay the claims and hence they were not medical expenses payable under the items of the insurance contract.

## I.

No one can contend that the insured did not have a serious heart problem. The fact that he died at the age of twenty-six years following open-heart surgery attests to this fact. This is also well supported by the medical records offered and received during trial.

The following three questions on the insured's application for group life and medical insurance were answered "No."

"3. Have you . . . consulted or been treated by a physician, surgeon or other practitioner in the past five years?

"4. Do you . . . contemplate having, or have you . . . had in the past five years, any surgery, treatment, observation or routine examination in any clinic, hospital, sanitarium or health resort?

"5. Do you . . . have any physical impairment or deformity or reason to believe you are not in sound physical condition?"

Defendant argues that Roland Nolden made misrepresentations in applying for insurance which increased the defendant's risk, as a matter of law, and that this question should not have been submitted to the jury. The trial court disagreed, however, and gave the jury the following special verdict question:

"Did the insured, Ronald Nolden, give an inaccurate or erroneous answer, or answers, to questions 3, 4 or 5 in his application for insurance?"

The jury answered the question, "No."

In *Zillmer v. Miglautsch*, 35 Wis.2d 691, 699, 151 N.W. 2d 741 (1967), this court discussed the standards which determine whether a case should be taken from the jury and a verdict directed for a party. There the court said:

"In determining whether or not the trial court was in error in failing to direct the verdict, this court must take that view of the evidence which is most favorable to the party . . . against whom the verdict was sought to be directed. . . If there is any evidence to sustain a defense or a cause of action, the case must be submitted to the jury . . . The weight and sufficiency of the evidence is for the jury . . . as is the weight to be given to the witness' positive or negative testimony. . . Furthermore, it is basic that the credibility of the evidence and the inferences to be drawn therefrom are matters for the jury . . . If there is any evidence other than mere conjecture or incredible evidence to support a contrary verdict, the case must go to the jury . . . Incredible evidence is evidence in conflict with the uniform course of nature or with fully established or conceded facts. . . ." (Citations omitted.)

Furthermore, a verdict will be directed:

". . . only when the evidence gives rise to no dispute as to the material issues or only when the evidence is so clear and convincing as reasonably to permit unbiased and impartial minds to come to but one conclusion." *Smith v. Pabst,* 233 Wis. 489, 491, 288 N.W. 780 (1940), *citing Rusch Sentinel-News Co.,* 212 Wis. 530, 533, 250 N.W. 405 (1933).

If a question is properly for the jury, the jury's verdict will not be disturbed if any credible evidence fairly admits of an inference supporting the verdict. *Zweifel v. Milwaukee Automobile Mut. Ins. Co.,* 28 Wis.2d 249, 254, 137 N.W.2d 6 (1965) ; *Ide v. Wamser,* 22 Wis.2d 325, 331, 126 N.W.2d 59 (1964). This is particularly true when the verdict has the approval of the trial court, as is the case here. *Metcalf v. Consolidated Badger Co-operative,* 28 Wis.2d 552, 137 N.W.2d 457 (1965). The evidence will be viewed in the light most favorable to the verdict. *Brunette v. Dade,* 25 Wis.2d 617, 131 N.W.2d 340 (1964).

From these authorities it is apparent that the defendant must sustain a heavy burden of persuasion. The grounds for avoiding an insurance policy on the basis of misrepresentation are prescribed by sec. 209.06(1), Stats. 1973,[1] which provides:

". . . No oral or written statement, representation or warranty made by the insured or in his behalf in the negotiation of a contract of insurance shall be deemed material or defeat or avoid the policy, unless such statement, representation or warranty was false and made with intent to deceive, or unless the matter misrepresented or made a warranty increased the risk or contributed to the loss."

Under this provision, a policy may be avoided if an insured's statement (1) was false and made with intent to deceive; (2) increased the risk; or (3) contributed to the loss. *Kreklow v. Miller*, 37 Wis.2d 12, 19, 154 N.W.2d 243 (1967). Defendant does not argue that the alleged misstatements were made with an intent to deceive, but rather that they increased the company's risk. The defendant further argues that, under sec. 209.06(1), Stats., the applicant's motives and state of mind are irrelevant.

There can be no dispute that the answers given to the application questions do not accurately reflect the medical facts about Nolden. However, there is a substantial conflict in the testimony on critical facts, and the issue cannot be resolved as a matter of law.

In 1957, when he was twelve, Nolden had been diagnosed as having a heart murmur caused by a congenital heart lesion or defect. In 1965, x-rays had revealed some enlargement of the heart and liver, indicating a back flow of blood into one of the chambers of the heart or a

---

[1] This section has now been replaced by sec. 631.11, Stats.

strengthening of the heart muscle to counteract the defect.

In March, 1967, Nolden was hospitalized for an appendectomy. Before surgery, x-rays were taken and an electrocardiogram performed. These tests showed massive cardiac enlargement; a shunt, or "short-circuit" of the flow of blood; moderate myocardial disease; increased pulmonary vascularity; abnormal triggering of the heartbeat; and the previously diagnosed congenital heart disease. Nolden was not advised of these medical findings. He was told that the tests were to examine his heart and lungs to determine whether he could safely undergo appendectomy surgery. He was advised that his pre-existing heart condition remained, but that it was not expected to interfere with surgery. His attending physician, Dr. Melvin F. Huth, who first diagnosed the heart murmur when Nolden was twelve years of age and had been his physician during the intervening years, testified that from what Nolden was told, he may have understood his condition to be a heart murmur and may also have understood that a congenital heart defect was the same thing as a heart murmur.

Nolden had no subjective symptoms of his condition prior to December 16, 1971; was never placed on any restrictions and took no medication as a result of it. It did not interfere with his normal activities or physically manifest itself in any way. He led an active life; worked long hours at strenuous work as a self-employed carpet installer; was an avid sportsman and hunter; and regularly snowmobiled and water-skied. He had landscaped around his home, planting trees and digging a pond; was seldom sick and appeared to be in excellent physical condition.

In June, 1971, Russell Greenwood, an employee-trainee of the James O'Hearn insurance agency and a longtime friend of the Noldens, contacted them to sell them insur-

ance. At Greenwood's suggestion, they applied for life and health insurance coverage from another insurance company. In taking the application, Greenwood inquired about Ronald Nolden's medical history. Nolden said that he had had a heart murmur as a child but that it had never bothered him and that he had never been treated for it. He also told Greenwood that he had had an appendectomy in 1967. The plaintiff testified, and Greenwood did not deny, that Greenwood then said that it was not necessary to report the appendectomy, because it had been performed nearly five years previously. This insurance company requested that Nolden have a physical examination, but he told Grenwood he could not spare the time from his carpet installation business. Because Nolden never took the physical, the policy for which he applied in June, 1971, was not issued to him.

In early August, 1971, Greenwood again contacted Nolden. He described the group health and life insurance available from the defendant through a group policy. A meeting was arranged for the evening of August 15, 1971, in the Nolden home. The details of that meeting are in dispute. It is clear that as a result of the meeting, Nolden was insured by the defendant.

To obtain the coverage, two forms were completed. The first was an application for membership in the group; the second was an enrollment form for the insurance. The enrollment form contained a series of yes-or-no questions. The three questions involved in this litigation have been previously set forth and, as stated, each was answered "No."

The parties disagree both as to the manner in which the form was completed and as to who was present at the time.

The plaintiff testified that the only persons present at the August 15, 1971, meeting were Russell Greenwood, her husband and herself. She further testified that her

husband did not complete the medical questions, but rather that Greenwood said he would answer them from the information contained in the earlier insurance application.

Greenwood was not a licensed agent for Mutual Benefit, but his employer, James O'Hearn, was. According to Greenwood and O'Hearn, O'Hearn was present at the August 15, 1971, meeting, and the application was "taken" by O'Hearn, with Greenwood present primarily as an observer or trainee. They testified that O'Hearn put the medical questions to Nolden, who answered each one "no." O'Hearn said there was no mention of the heart murmur or appendectomy; Greenwood recalled something being said about the appendectomy, but felt that it was very close to five years and that appendectomies were not very important unless there were complications. Greenwood conceded that on August 15, 1971, he was aware of both Nolden's childhood heart murmur and his appendectomy, but he did not mention them.

Greenwood's name does not appear on either of the forms signed by Nolden. The application for membership in the group is countersigned by O'Hearn as "Local Agent." However, a check written by plaintiff, dated August 18, 1971, which plaintiff testified was for the first insurance premium, was made payable to Russ Greenwood. The check was endorsed by Greenwood to O'Hearn.

The insurance application was approved, but would have been rejected if the company had known of Nolden's heart condition as indicated by his medical records. Any mention of a heart murmur would have prompted the company to inquire further.

Greenwood informed Nolden that the policy had been approved, and delivered the policy and related papers to the Noldens. Thereafter he serviced the policy.

In December, 1971, about four months after obtaining the insurance, Nolden developed an auricular fibrillation and was hospitalized for two days. In January, 1972, he went to St. Mary's Hospital in Madison for extensive tests, and open-heart surgery was recommended. Nolden contacted Greenwood to determine whether the expenses would be covered by the insurance and Greenwood advised him that he believed they would. The surgery was performed February 10, 1972. Nolden died the following day.

It cannot be said that the evidence introduced by either party was inherently incredible, and the resolution of the controversy was properly for the jury.

There is credible evidence to support the theory that Greenwood answered the medical questions and that O'Hearn was not present at the meeting. In addition to the plaintiff's direct testimony to that effect, there is the fact that the Noldens had dealt exclusively with Greenwood prior to August 15, 1971. He serviced the policy thereafter. He was their longtime friend and was aware of Nolden's appendectomy and that he had had a childhood heart murmur.

The jury may well have disbelieved the testimony that O'Hearn was present for several reasons. O'Hearn admittedly had never met the Noldens before the date of the meeting and had no dealings with them thereafter. O'Hearn's own account of the meeting was couched in terms of the "normal" interview, and the jury may have inferred that O'Hearn had little or no direct recollection of the meeting. The jury may also have believed that Greenwood and O'Hearn had an interest in establishing that the application was not taken by Greenwood, who was unlicensed to sell for that company. There is thus credible evidence from which the jury could have concluded that the questions were in fact answered by Greenwood.

A material misstatement of facts known to the applicant may constitute a defense although made without intent to deceive. *See: Delaney v. Prudential Ins. Co.*, 29 Wis.2d 345, 352, 139 N.W.2d 48 (1966). However, sec. 209.06, Stats., has never been construed to require the applicant to disclose more than he knows. The statute does not make the applicant an absolute guarantor of his medical condition; it requires only that his answers accurately reflect his condition and history as he knows it to be.

In determining whether Nolden misstated the facts regarding his heart condition, it is important to recall Greenwood's earlier statements to Nolden. Plaintiff testified that Greenwood had said it was not necessary for Nolden to report the appendectomy when he applied for similar insurance less than three months earlier, because almost five years had passed since the appendectomy. Greenwood considered it part of his job to explain application questions to his clients. In addition, the intent of sec. 209.06, Stats.:

". . . is to permit one to recover when he, acting in good faith, has done honestly all he is led by the agent of defendant to believe he is required to do to secure protection by insurance." *Taluc v. Fall Creek Farmers Mut. F. Ins. Co.*, 203 Wis. 319, 323, 234 N.W. 364 (1931).

Viewing the evidence as a whole, the jury could have concluded that Nolden had revealed what he knew of his heart condition. That was also the finding of the trial court. Nolden told Greenwood in June that he had had a heart murmur as a child, but that it had never bothered him and that he had never been treated for it. He did not specifically say that it had disappeared.

There is no evidence that Nolden ever considered his condition to be anything but a heart murmur. Even

defendant's witnesses agreed that knowledge of a heart murmur is not itself sufficient to indicate a condition of consequence. Nolden told his wife before they were married that he had a heart murmur. His wife's mother had once suggested that his wife visit the Mayo Clinic and that he go along to have his heart murmur checked. He dismissed the idea because his heart had never bothered him. This evidence is not inconsistent with his statement to Greenwood.

Question 5 asks whether the applicant has "any physical impairment or deformity, or reason to believe [he is] not in sound physical condition?" This question called for a layman's answer rather than an expert medical opinion. *Fuchs v. Old Line Life Ins. Co.*, 46 Wis.2d 67, 70, 174 N.W.2d 273 (1970). By asking only four questions concerning insurability and by not requiring a medical examination, the defendant has assumed more than ordinary risks. *See: Fuchs v. Old Line Life Ins. Co.*, *supra*, and *Southard v. Occidental Life Ins. Co.*, 31 Wis.2d 351, 142 N.W.2d 844 (1966). The question calls for the applicant's judgment or opinion. *Schneider v. Wisconsin Life Ins. Co.*, 273 Wis. 105, 76 N.W.2d 586 (1956). Any ambiguity should be construed against the company which prepared the form.

In *Fuchs v. Old Line Life Ins. Co.*, *supra*, this court considered a similar application question. There the court said, at 73:

". . . [O]ne who is afflicted with a disease or illness does not ordinarily consider himself to be suffering from a physical impairment until the disease or illness results in a partial or complete loss of function of some part of his body."

Although Fuchs had had a heart attack and continued to suffer from heart disease, he was physically very active in his business, and his condition did not incapacitate

him or interfere with his usual occupation. This court therefore held that he was not suffering from a "sickness" as the word is commonly used.

Similarly, Nolden led an extremely active life. His heart condition never manifested itself physically. It did not interfere with even the most strenuous work or affect his life in any way. He was never given any medication for it, nor told to restrict his activities. As far as the record shows, he had not visited a doctor since 1967, nor had he ever been told that his condition was serious or likely to impair his physical condition. On this evidence, it cannot be said as a matter of law that he had reason to believe he was not in a sound physical condition.

We conclude there is credible evidence to support the answer of the jury to the third question of the special verdict, and that Nolden did not, as a matter of law, give erroneous answers to the medical questions.

## II.

The jury found, in response to special verdict questions, that Russell Greenwood was the defendant's agent in his dealings with Ronald Nolden, and that Greenwood had personal knowledge of Nolden's appendectomy and heart condition. The trial court approved these findings. The defendant maintains that the record establishes, as a matter of law, that: (1) Greenwood was not defendant's agent; (2) Greenwood had insufficient knowledge of Nolden's condition to give rise to waiver or an estoppel; and (3) there was no detrimental reliance sufficient to support a theory of estoppel.

Section 209.047, Stats. 1973, provided in part:[2]

___

[2] Sec. 209.047, Stats. 1973, was repealed, effective June 17, 1976, by Laws of 1975, ch. 371, sec. 26.

"*209.047 Agent defined.* Every person who solicits, negotiates or effects insurance of any kind, . . . on behalf of any insurance company, . . . or person desiring insurance, or transmits an application for a policy of insurance . . . other than for himself, to and from any such company, or who makes or proposes to make any contract for insurance . . . or who collects any premium, assessment, fees or dues for insurance . . . in any manner aids or assists in doing either, or in transacting any business of like nature for any insurance company, . . . shall be held to be an agent of such insurer to all intents and purposes, unless it can be shown that he receives no compensation for such services. . . ."

There is abundant evidence that Greenwood solicited the Noldens to buy insurance. He contacted them, described the insurance, and arranged the meeting. At the very least, he thus aided in the solicitation. In addition, the plaintiff testified that she paid the first premium to him. He delivered the policy pamphlet and other papers and serviced the policy thereafter.

Under sec. 209.047, Stats., this evidence plainly shifts the burden to the company to show that Greenwood received no compensation.

Greenwood testified that he received no compensation directly from the defendant, Mutual Benefit, for the sale, and that his compensation ordinarily consisted of commissions from the two companies for which he was licensed. However, his testimony does not indicate whether he received any compensation from the O'Hearn agency or the Noldens for the sale. The plaintiff wrote a check payable to Greenwood, which he endorsed to O'Hearn. The jury could reasonably have inferred that his compensation came from that check, or that, in any event, he would not have solicited the business unless he was to receive some compensation from the O'Hearn agency.

The defendant contends that Greenwood's knowledge of the heart condition was insufficient to estop defend-

ant or give rise to a waiver. The first argument is that there could be no estoppel without disclosure of the full facts indicated on Nolden's medical records, even if those facts were unknown to Nolden. The second argument is that Nolden did not disclose all he knew of his condition. Both of these arguments have been discussed previously. There was credible evidence from which the jury could believe that Nolden, acting in good faith, had revealed what he considered to be the full extent of his condition. Such disclosure, to an agent of the insurer, is sufficient to support a waiver or an estoppel.

The defendant insists that there can be no estoppel because there could be no detrimental reliance upon the defendant's approval of the insurance. An estoppel cannot arise without evidence that the party claiming the benefit of the estoppel has relied on the conduct or inaction of the other party. *Ryder v. State Farm Mut. Auto Ins. Co.*, 51 Wis.2d 318, 325, 187 N.W.2d 176 (1971).

"An estoppel arises where it would be inequitable to permit the insurer to raise a policy defense. Estoppel depends upon a prejudicial change of position by the insured or by an injured third party. . . ." *Ryder v. State Farm, supra*, 323.

". . . An estoppel *in pais* consists of action or nonaction on the part of one against whom the estoppel is asserted which induces reliance thereon by another, either in the form of action or nonaction, to his detriment. . . ." *City of Milwaukee v. Milwaukee County*, 27 Wis.2d 53, 66, 133 N.W.2d 393 (1965).

The defendant contends that there can be no detrimental reliance here. Defendant concedes that such reliance would exist if Nolden had failed to obtain insurance coverage elsewhere only because he assumed he was insured by defendant, but asserts that Nolden's heart condition would have made it impossible for him to secure other coverage. It is not necessary to reach this as-

sertion, or to determine whether Nolden might have taken some other action to protect himself and his family against medical expenses and his own death if he had known of the company's defense.

The record shows that in January, 1972, following several days of tests at St. Mary's Hospital in Madison, Nolden contacted Greenwood. The physicians had recommended open-heart surgery. According to Greenwood, Nolden "was concerned as to whether or not the company would pay the benefits of the hospital bills that he was going to have if he went in for surgery." Greenwood expressed the opinion that the company would probably continue to pay, as it had on several earlier bills. The record does not make clear the extent to which the heart surgery was elective. Greenwood's testimony indicates, however, that Nolden had some element of choice, if only as to the timing of the surgery, and chose to proceed, relying on the insurance coverage. This was sufficient reliance to estop the company from denying coverage.

Finally, the defendant vigorously and extensively argues that a new trial should be granted in the interest of justice. The rule for discretionary reversal by this court under sec. 251.09, Stats., has been stated many times. *Jonas v. Northeastern Mut. Fire Ins. Co.,* 44 Wis.2d 347, 171 N.W.2d 185 (1969); *Lautenschlager v. Hamburg,* 41 Wis.2d 623, 635, 165 N.W.2d 129 (1969). This has been interpreted to mean that:

". . . the evidence and the law must be such that the [complaining party] probably should have won and should therefore be given another chance. . . ." *Savina v. Wisconsin Gas Co.,* 36 Wis.2d 694, 704, 154 N.W.2d 237 (1967).

The trial court denied defendant's motion for a new trial in the interest of justice. A trial court's ruling on such a motion will not be reversed on appeal in the absence of a clear showing of abuse of discretion or an erroneous application of the law. *Bode v. Buchman*, 68 Wis.2d 276, 290, 228 N.W.2d 718 (1975).

We have considered each of the arguments advanced by the defendant in support of its request for a discretionary reversal. After examining the entire record, we are of the opinion that it cannot be held that the real controversy has not been fully tried, or that it is probable that justice has for any reason been denied. Therefore we do not reverse the judgment of the trial court.

## III.

The last issue is whether the defendant is required to pay those medical claims for which the creditors did not timely file claims against the estate of Ronald A. Nolden, deceased. The parties have stipulated that prior to Nolden's death, he had incurred $9,984.90 in medical expenses. Summary assignment proceedings were commenced and a three-months notice to creditors was published. Section 867.02(4), Stats., bars creditors from bringing an action against property assigned in such proceedings more than three months after publication of the notice to creditors. Medical creditors with total claims of $7,572.90 failed to file claims or to commence actions within the statutory period.

The trial court found the defendant was not liable for the payment of the medical claims not timely filed against the estate of the deceased, and judgment was entered accordingly. The plaintiff has filed a motion of review as to that portion of the judgment.

The group insurance contract issued by the defendant and under review provided in clause B7:

"B7 Covered charges shall consist of the following charges incurred while insured hereunder by an insured individual for medical care, services and supplies which are necessary for the treatment of an injury or sickness and are prescribed or ordered by a licensed physician, subject to the limitations in Section B8.

"(a) . . .

" . . .

"(k) . . .

"The charges listed in (a) through (k) above shall in no event include any amount of such charges *for which payment is not legally required,* or which are in excess of the reasonable and customary charges for the medical care, services and supplies furnished.

"A covered charge shall be deemed to be incurred on the date the particular medical care, service or supply is rendered or obtained." (Emphasis added.)

The underlined clause also appears in Comprehensive Major Medical Provision 7 of the Certificate of Group Insurance.

Relying principally on this language, the trial court ruled that the defendant was not liable for those expenses for which no timely claim was filed, because the estate was not legally required to pay the expenses.

The defendant argues that this result is supported by sound public policy and that any other result would provide the Ronald Nolden estate with a windfall recovery, because the estate is under no obligation to pay the claims.

The plaintiff contends that in assessing the company's liability, a court must focus narrowly on the time at which the medical services were rendered. The company's obligation is to Nolden and becomes fixed as of the time the expenses are incurred, she argues. On this theory, the subsequent proceedings in his estate are wholly irrelevant.

In support of this position, plaintiff relies upon policy provision B7, *supra*, which states in part that:

"A covered charge shall be deemed to be incurred on the date the particular medical care, service or supply is rendered. . . ."

Provision CMM13 of the Certificate of Group Insurance also provides that benefits for covered expenses "will be paid to the person insured immediately upon receipt of due written proof." When viewed as a whole, plaintiff argues, the policy reveals an intent that the respective rights of the parties be determined as of the time expenses are incurred.

This argument is not persuasive. Policy provision D4 states that benefits other than death benefits "will be paid to the person insured, if living, otherwise to his estate." This contemplates that the company's obligation will be determined with relation to the estate in the event the insured is deceased. Even under provision CMM13, *supra*, the company's duty to pay does not become absolute until a proof of claim is filed.

In this case, proofs of claim were not filed until after Nolden's death. Indeed, the expenses were unliquidated at the time of Nolden's death. Plaintiff's theory that the company's obligation became irrevocably fixed when the medical care was provided is not convincing when the obligation was not reduced to a sum certain, and when the company had incurred no immediate duty to pay the benefits, until after Nolden's death.

Therefore the company's obligation is to the estate, and does not extend to charges which the estate is not legally required to pay. To hold the company liable for claims which have effectively been extinguished would be to unjustly enrich the estate.

The plaintiff invokes statements by this court that the "rights of the insureds as against the insurer are deter-

mined as of the date of loss." *Rock County S. & T. Co.
v. London Assur. Co.,* 17 Wis.2d 618, 620, 117 N.W.2d
676 (1962). Plaintiff relies particularly on *Kolehouse v.
Connecticut Fire Ins. Co.,* 267 Wis. 120, 128, 65 N.W.2d
28 (1954).

That case involved the respective rights of parties to a
conditional contract for the sale of a truck. The truck had
been insured, the purchaser had defaulted on the contract,
and the truck had then been damaged. The seller had then
repossessed the truck, but had failed to comply with
statutory foreclosure requirements. As a result, the
puchaser's indebtedness to the seller had been discharged.
Both parties then sought to recover the insurance pro-
ceeds.

In this complicated setting, this court determined that
the seller was entitled to share in the proceeds although
the debt had been discharged. The court held that the
seller's insurable interest in the truck was distinct and
apart from the indebtedness owing on it. The right of an
insured to recover for loss covered by the policy is de-
termined as of the date of the loss, the court said, and
this right is unaffected by subsequent events. *Kolehouse,
supra,* 126, 128.

From this plaintiff argues (1) that Nolden's right to
recover the value of the medical expenses vested when
the expenses were incurred and is unaffected by sub-
sequent events, and (2) that the subsequent extinguish-
ment of his indebtedness does not destroy his insurable
interest. *Kolehouse* does not compel this conclusion, how-
ever. The insurer in *Kolehouse* did not contest liability,
but rather paid the proceeds into court for apportionment
between the parties, both of whom were insured under
the policy "as interest may appear."

Both *Kolehouse, supra,* and *Rock County S. & T. Co.
v. London Assur. Co., supra,* speak of the date of *loss.*
Here there has been no loss. Whatever obligation Nolden

may have had to the creditors has been extinguished, without expense to Nolden or his estate. In contrast the insured seller in *Kolehouse* had a distinct and measurable loss in an amount equal to the unpaid balance on the truck. The court expressly recognized that it would have constituted unjust enrichment to permit the creditor to recover more than its actual insurable interest. *Kolehouse, supra,* 129.

The cases invoked by plaintiff are therefore not persuasive. Rather, we believe that the trial court correctly applied the policy provisions and that the company is not liable for the unfiled claims.

The plaintiff expresses concern that by making the insurer's obligations contingent upon the proceedings in the estate, the trial court invites insurers to delay payment of medical benefits, on the chance that medical claims will be extinguished by the statute of nonclaim. However, it is not clear how any such delay would prejudice the decedent's estate. If an insurer withholds payment because the liability of the estate is uncertain or contingent, it would appear to follow that the estate would not be under any present legal obligation to pay the claim.

The request of the plaintiff for modification of the judgment in regard to the unfiled medical claims is denied.

The question of whether the rights of the medical creditors have been irrevocably extinguished was not litigated. It therefore follows that this decision does not consider that issue or possible consequences that might flow from an adjudication of it.

*By the Court.*—Judgment affirmed.