FUCHS, Respondent, v. OLD LINE LIFE INSURANCE COMPANY, Appellant.

*No. 67. Argued February 2, 1970.—Decided March 3, 1970.*
(Also reported in 174 N. W. 2d 273.)

68

For the appellant there were briefs by *Petersen, Axley, Brynelson & Herrick* of Madison, and oral argument by *James C. Herrick.*

For the respondent there was a brief and oral argument by *Ralph R. Stowe* of Elkhorn.

CONNOR T. HANSEN, J. The issue on this appeal is defendant's claim that the application for insurance made by Fuchs on November 30, 1963, contained a misrepresentation and the policy of life insurance issued pursuant to that application is void under sec. 209.06, Stats.[1]

---

[1] "209.06 Insurance; application; effect. (1) No oral or written statement, representation or warranty made by the insured or in

The answer which defendant is now challenging, along with the question is as follows:

"9. To the best of your knowledge and belief:
"a. Are you now free of any sickness or physical impairment? Yes ☒ No ☐"

The first element required to defeat or void a policy of insurance under sec. 209.06, Stats., is a finding that an applicant's statement was false or constituted a misrepresentation. Thus, in this case, the defendant had to establish that Fuchs, when he signed the application, was not free of "sickness or physical impairment." [2] Whether or not this was true necessitates an analysis of the terms "sickness" and "physical impairment." Such an examination must be made with respect to the context in which the terms were used and in recognition that a layman's answer—not a medical opinion—was called for. *Southard v. Occidental Life Ins. Co.* (1966), 31 Wis. 2d 351, 142 N. W. 2d 844.

The application which Fuchs signed asked only two questions concerning insurability [3] and is similar in its brevity to the application discussed in *Southard v. Occidental Life Ins. Co.*, *supra*, which also included only two insurability questions. The issue on appeal in *Southard* was whether the insured, who was a quadriplegic, had " 'heart disease, diabetes, lung disease, cancer or any other serious illness, or received treatment or medication

his behalf in the negotiation of a contract of insurance shall be deemed material or defeat or avoid the policy, unless such statement, representation or warranty was false and made with intent to deceive, or unless the matter misrepresented or made a warranty increased the risk or contributed to the loss."

[2] The trial court held that if the statement was false it increased the risk and contributed to the loss. Plaintiff, on appeal, raised no question concerning this holding by the trial court.

[3] In addition to the question claimed to be falsely answered, the application also inquired: "Have you been advised to have an operation?" to which the insured replied, "No."

for blood pressure?'" This court commented upon the setting in which the question was asked.

". . . This inquiry in the application relating to insurability is limited and does not cover all illnesses but only serious illnesses of a limited classification. This and the question relating to confinement in a hospital or sanitorium and treatment for blood pressure were all the insurance company was interested in or considered necessary for the type of group life insurance offered. It does not ask whether the applicant was free from any physical impairment, whether he considered himself in good health, or except for blood pressure whether he had received any medical treatment or advice. Obviously the risks assumed under this group plan are greater than those assumed under individual policies requiring more detailed information and a medical examination and presumably the premiums were related and adjusted to the risks thus assumed." *Southard v. Occidental Life Ins. Co., supra,* pages 356, 357.

In like manner, the defendant in this case assumed greater risks than ordinary when its inquiries were limited to two general questions, and when no medical examination was required. The policy in this case, however, was not solicited by mail but was issued in connection with a mortgage loan. The application was filled out by defendant's agent, pursuant to answers elicited from Fuchs, after which it was signed by Fuchs. It was in this context inquiry was made as to whether Fuchs was "now" free from any "sickness" or "physical impairment" on November 30, 1963.

We have found no authority wherein courts have defined "sickness" with respect to life insurance applications. However, the word "sickness" is found in health, medical and hospitalization insurance policies. There are, of course, obvious differences between health and life insurance policies. In addition, the word "sickness" appears in the health insurance policy itself and not the application, and it is in this context the word has been

defined. Nevertheless, cases dealing with health insurance are pertinent because they have given "sickness" a lay or popular definition—the objective sought in this case.

"The words 'sickness' and 'disease' are technically synonymous, but when given the popular meaning as required in construing a contract of insurance, 'sickness' is a condition interfering with one's usual activities, whereas disease may exist without such result; in other words, one is not ordinarily considered sick who performs his usual occupation, though some organ of the body may be affected, but is regarded as sick when such diseased condition has advanced far enough to incapacitate him." 43 Am. Jur. 2d, *Insurance*, p. 1121, sec. 1206. *See also* 10 Couch, *Insurance* 2d, sec. 41:801, and cases cited therein.

Also, we have found no cases which establish a judicial definition of the term "physical impairment" as used and understood by a layman in an application for life insurance. The word "physical" has been stated to mean:

"Relating or pertaining to the body, as distinguished from the mind or soul or the emotions; material, substantive, having an objective existence, as distinguished from imaginary or fictitious; real, having relation to facts, as distinguished from moral or constructive." Black's Law Dictionary (4th ed.).

There is a general definition of "impairment" in 42 C. J. S., *Impairment*, p. 399: ". . . deterioration, injury, or the state of being impaired; and, in a particular connection, as meaning a partial or complete loss of the function of a member of the body or of the body as a whole."

Giving "physical impairment" the ordinary meaning as used in common speech, the term denotes a defect or infirmity limiting or making useless a member [4] or limb

---

[4] *"In anatomy.* A member is a part or organ of the animal body; a part appurtenant to the body; a subordinate part of the main body; a limb or other separable part or other functional organ

of the body. However, one could have a physical impairment and still not be considered suffering from any illness or disease. This was the manner in which the term was employed by this court in *Southard.*

"True, quadriplegia is a serious physical impairment but so is the loss of a limb, or blindness, or total deafness. But such handicaps are not commonly thought of as illnesses even though they may possibly tend to shorten the span of life by increasing the risk of accidental death. A tube in a bladder to aid its functioning would seem to be a condition or an aid to a physical impairment, not an illness. . . ." *Southard v. Occidental Life Ins. Co., supra,* page 357.

Thus, one who is afflicted with a disease or illness does not ordinarily consider himself to be suffering from a physical impairment until the disease or illness results in a partial or complete loss of function of some part of his body.

The question then is whether Fuchs was free of any "sickness or physical impairment" on November 30, 1963.

On October 18, 1961, at the age of thirty-five, Fuchs was admitted to a hospital for treatment of an acute myocardial infarction and discharged on November 3, 1961. On March 28, 1962, the insured consulted Dr. Robert F. Wichser, an internal medicine specialist. A deposition of Dr. Wichser was admitted into evidence wherein the tests and examinations given the insured were described as well as the diagnosis:

"*A.* My diagnosis was of several parts, the first being that of heart disease on the basis of atherosclerosis with coronary blood vessel involvement to produce a prior myocardial infarction and probably responsible for an angina of effort at the time he was first seen by me."

---

of an animal body, as an arm, a leg, or a private part. It has been said that in common usage the term 'member,' as applied to the human body, means the extremities of the body and particularly the arms and legs." 57 C. J. S., *Member*, p. 1046.

"*A*. . . .

"In the case of Mr. Fuchs this did not produce any state which was incompatible with life and he was able to survive it, and this injured area was then replaced by scar tissue. The area of the scar tissue was large enough to be detected by an electrocardiogram which was done in my office and characterized by certain changes which enabled my seeing that he had an old stabilized or healed anterior myocardial infarction."

Dr. Wichser stated the insured's life expectancy "was not as good as the average person's by far," and he prescribed a muscle relaxant to allow the blood vessel wall to open up more completely. Fuchs continued to take such medicine until the time of his death. Dr. Wichser also told the insured he could go back to work, however there was certain heavy work he would have to avoid.

At the trial plaintiff called as a rebuttal witness, Dr. Glenn A. Smiley, a physician and surgeon whom Fuchs contacted in March, 1964, after applying for insurance. Dr. Smiley diagnosed a stable healed infarct, a diagnosis identical to that of Dr. Wichser. Dr. Smiley explained the meaning of "stable healed infarct":

"*A*. A stable healed infarct is principally an interpretation from laboratory and electrocardiographic findings; it means this person has had a heart damage and that it is not progressing but that the electrocardiographic findings remain the same, the laboratory tests have returned to normal and the patient is without any change of symptoms or without symptoms."

Dr. Smiley stated he had occasion to observe the insured in his day-to-day activities and characterized him as a "very dynamic active person; he had a tremendous amount of drive and [was] physically very active in his business."

On November 30, 1963, Fuchs was suffering from "heart disease on the basis of atherosclerosis." However, the condition did not interfere with his normal activities; he was not incapacitated or unable to perform

his usual occupation; thus, Fuchs was not suffering from a "sickness" as the word is commonly used.

Nor, from a layman's viewpoint, can the insured's heart disease be considered a "physical impairment," at the time when the application for insurance was filled out. As far as Fuchs was concerned, he had suffered a heart attack and had an anterior myocardial infarction which had stabilized or healed. This had not limited his activities other than heavy lifting, and there is evidence he was physically very active in his business. The atherosclerosis had not progressed to where any member of the body had been limited or rendered useless. Under these conditions, a layman would not generally consider himself to be suffering from a "physical impairment" at the time the application was executed, and as that term is commonly employed. Therefore, the trial court was correct in finding that Fuchs made no false statement or misrepresentation in completing the insurance application on November 30, 1963.

*By the Court.*—Judgment affirmed.