Revcor, Inc., Plaintiff-Appellant, v. Fame, Inc., a Corporation, and Rene Marchal, et al., Defendants-Appellees.

Gen. No. 67–4.

Second District.

July 17, 1967.

Canfield, Canfield and Franks, of Rockford, for appellant.

Miller, Thomas, Hickey and Collins, and Williams, McCarthy, Kinley and Ruby, of Rockford, for appellees.

MR. PRESIDING JUSTICE DAVIS delivered the opinion of the court.

Revcor, Inc., (herein called Revcor), plaintiff-appellant, brought this suit to enjoin the defendants, Fame, Inc., (herein called Fame), Rene Marchal, William Fulton and Charles Wilson from manufacturing and selling strip-type blower wheels. The trial court enjoined Fame, Marchal and Fulton from producing these wheels for a period of three months, but refused to issue an injunction prohibiting Wilson from selling such wheels. Revcor appealed and here contends that the injunction should have been granted for a longer period of time, and that the trial court also should have enjoined Wilson from selling the blower wheels.

Revcor was in the business of manufacturing air moving components. Marchal and Fulton were the incorporators and owners of United Tool and Engineering Company. They were tool and die makers who were hired by Revcor to produce certain tools and dies to enable Revcor to manufacture strip blower wheels. Fame was a corporation which was formed by Marchal and Fulton to manufacture and sell strip blower wheels in competition with Revcor. Wilson, who had been the sales manager for Revcor, left its employment and established his own business as a manufacturer's representative. Shortly

thereafter, he became a representative of Fame, and sold strip blower wheels which it manufactured.

Revcor first started manufacturing blower wheels in 1953, but did not commence investigating strip-type blower wheels until sometime in 1957, and did not start producing this type of blower wheel until 1960. The strip-type blower wheel involved an entirely different manufacturing process than that utilized by Revcor in the manufacture of its other blower wheels. Initially, Revcor obtained the tools for the manufacture of the strip wheels from a Detroit, Michigan company, but these did not perform satisfactorily.

Sometime in 1961, Revcor contacted Marchal and Fulton regarding the tools needed for the manufacture of the strip wheels. Revcor had spent considerable time in making the drawings and designs it needed for this product. It gave its complete drawings to Marchal and Fulton, owners of United Tool and Engineering Company, so that they could construct the tools needed for the manufacture of the strip wheels. These drawings, not available to others, showed the complete details of the strip wheel—including angles, tolerances, dimensions, etc. In addition to the drawings turned over to them, Marchal and Fulton had complete access to the Revcor plant from 1961 to 1964. With this information, Marchal and Fulton manufactured the tools and dies used by Revcor in the production of the strip blower wheels.

In August of 1964, Revcor discovered that Marchal and Fulton, under the corporate name of Fame, were manufacturing strip blower wheels in competition with it. Certain testimony indicated that Fame's wheels more closely conformed to the Revcor drawings than did the Revcor wheels.

After discovering that Fame had entered into competition with Revcor, the president of Revcor went to the office of Fame and picked up a large number of drawings which belonged to Revcor and related to the strip

wheel. The evidence was conflicting as to whether Marchal and Fulton could have duplicated the Revcor wheel from the wheel itself, or whether the use of the drawings and prints were necessary in order for Fame to reproduce the wheel in the period of time within which it started such production.

As to the defendant, Wilson: After leaving Revcor in December of 1964 to become a manufacturer's representative, he wrote and otherwise contacted a number of companies, including his former employer, Revcor, seeking to represent them. He had access to all information regarding plaintiff's customers while he was its sales manager, yet there was no evidence that he took any lists with him. Wilson testified that there are published lists of customers for blower products and that there is a directory of heating, air conditioning and refrigeration industries—one of the major purchasers of blower wheels.

The strip blower wheel was not patented. A number of different companies manufactured such a wheel. It also seems apparent from the testimony of several of defendants' witnesses that the strip wheel could be copied—perhaps with some difficulty—from the wheel itself. .

Revcor contends that its manufacturing plans and processes perfected over an extended period of investigation and development, are trade secrets; and that the defendants, Marchal and Fulton, appropriated these plans and processes unlawfully, by use of the specific and confidential information, the drawings and the designs given them by Revcor for the manufacture of its tools and dies.

The recent case of Schulenburg v. Signatrol, Inc., 33 Ill2d 379, 212 NE2d 865 (1965) controls our determination in this case. In Schulenburg, the plaintiffs were engaged in the business of assembling light flashers, and the defendants—prior employees—set up a competing business. It was conceded that the flasher was

354

not patented and that the method of assembly was not a trade secret. It was contended, however, that the manufacturing "know-how" of plaintiffs was a trade secret. There, as in this case, it appeared that the defendants had utilized plaintiffs' blueprints and drawings used in the manufacturing process.

The court characterized the question before it as, "how did the defendants go about reproducing the plaintiffs' flasher? Did they violate the confidence reposed by their employer by appropriating, in an unlawful manner, the trade secrets of the plaintiffs?"

 A trade secret is defined as "a secret plan or process, tool, mechanism or compound known only to its owner and those of his employees to whom it is necessary to confide it." Schulenburg v. Signatrol, Inc., supra, 385; Victor Chemical Works v. Iliff, 299 Ill 532, 545, 546, 132 NE 806 (1921). A trade secret is something which must be held in secret or confidence by the one who possesses it, and it must relate to the trade or business. Unquestionably, the prints and drawings of Revcor were such a trade secret. They were not something held out for public domain but were treated, rather, as confidential information by Revcor. It appears they were developed by Revcor through both the trial and error process, and by extensive investigation, which had probed the product of Revcor's leading competitor in the industry—a company which had been making this type of wheel for sometime when Revcor decided to get into this field of manufacturing. The results of Revcor's labor, its designs and its drawings, were kept confidential, except for their disclosure to the defendants who needed access to this information in order to design the requested tools and dies. Such plan or process was thus a trade secret. Schulenburg v. Signatrol, Inc., supra, 385; Schulenburg v. Signatrol Inc., 50 Ill App2d 402, 408, 200 NE2d 615 (1964).

355

■ Apparently, the defendants could have duplicated this product without the use of Revcor's drawings. This, however, would have been more difficult, and time-consuming. Obviously, it would have been more expensive, and might have resulted in some errors in the finished product. The defendants, Marchal and Fulton, avoided these pitfalls and difficulties by the use of plaintiff's drawings. The fact that there was a perfectly lawful and legal manner of duplicating the wheels did not relieve them of liability where they have chosen to follow the unlawful route of utilizing the confidential and particularized information given to them by Revcor. Schulenburg v. Signatrol, Inc., supra, 386, 387 (1965); Schulenburg v. Signatrol Inc., supra, 410, 411 (1964).

As in Schulenburg, the real difficulty in this case lies in the determination of whether the scope of the injunction was proper. In Schulenburg, the court, on page 388, defined the proper scope of the injunction as being that period required for the defendants to duplicate the strip wheel by lawful means.

The trial court enjoined the defendants from manufacturing and selling strip wheels for a period of only three months. It appears that Revcor took substantially longer than this to develop its manufacturing plans and processes; however, it concedes that those working on the plans and processes were not devoting their full time to the project. The trial court was aware of the decision of the Supreme Court in Schulenburg and made its determination with the knowledge of the standard there set forth. It also observed the witnesses and their demeanor on the witness stand in its total evaluation of the evidence before it.

■ We will not reverse the trial court's findings unless they are palpably contrary to the manifest weight of the evidence. Kropp Forge Co. v. Jawitz, 37 Ill App 2d 475, 483, 186 NE2d 76 (1962); Flynn v. Zimmerman, 23 Ill App2d 467, 477, 163 NE2d 568 (1960). The proof

was conflicting and meager relative to the amount of time required to reproduce the plaintiff's product by lawful means. The record on this phase of the case does not support the plaintiff's contention that the trial court's finding as to the time limit of the injunction was palpably contrary to the manifest weight of the evidence. Under these circumstances, we cannot reverse the trial court in this respect. Schulenburg v. Signatrol, Inc., 37 Ill2d 352, 356–359 incl., 226 NE2d 624 (1967).

As to the defendant Wilson, it is conceded that he took no lists with him, and there is no evidence that he departed from the plaintiff's employment with any confidential information obtained by him as its sales manager. He had no contract with Revcor which prohibited him from entering into a competing business.

■ Our free economy is based upon competition. One who works for another cannot be compelled to erase from his mind all of the general skills, knowledge, acquaintances and the over-all experience which he acquired during the course of his employment. The success of a person who is engaged in sales depends largely upon his personal friendships and the confidences inherent therein. Absent special circumstances, such person cannot be prevented from seeking out customers of his former employer when he has entered into a competing business or gone to work for a competitor.

■■ If a salesman has agreed to a restrictive covenant in his employment contract, or if he has fraudulently and surreptitiously copied or removed lists of customers from a prior employer, or if the names of actual or potential customers are confidential, not subject to memory, are not publicly listed or otherwise readily obtainable, then, under proper circumstances, such salesman might be enjoined from soliciting business from the customers of his prior employer. Absent such circumstances, however, there can be no such prohibition. Mid-

■

States Vending Service v. Rosen, 77 Ill App2d 83, 86, 87, 222 NE2d 99 (1966); Professional Service Corp. v. Johnson, 316 Ill App 431, 434, 45 NE2d 191 (1942); American Cleaners & Dyers v. Foreman, 252 Ill App 122, 126 (1929); 126 ALR 758. Wilson did not take any customer lists with him. There was no particular difficulty in determining potential customers for the strip blower wheel from available public sources. Under the circumstances, it would not have been proper to enjoin Wilson in any manner.

For the reasons herein stated, the judgment of the trial court is affirmed.

Judgment affirmed.

MORAN and ABRAHAMSON, JJ., concur.