CORROON & BLACK-RUTTERS & ROBERTS, INC.,
Plaintiff-Respondent-Petitioner,

v.

Jack HOSCH, Defendant-Appellant.

Supreme Court

*No. 80–2337. Argued September 7, 1982.—Decided November 2, 1982.*

(Also reported in 325 N.W.2d 883.)

For the plaintiff-petitioner there were briefs by *Kenneth M. Kenney* and *Kenney, Krembs & Fellows*, Milwaukee, and oral argument by *Kenneth M. Kenney*.

For the defendant-appellant there was a brief by *Tom E. Hayes, M. Susan Maloney* and *Hayes & Hayes*, and oral argument by *William A. Stearns* of *Quarles & Brady*, all of Milwaukee.

LOUIS J. CECI, J. The question presented is whether it is unfair competition for an insurance agent to use his former employer's customer lists to direct clients to the agent's new insurance agency.

A jury found that the defendant, Jack Hosch, had unfairly used confidential information to compete with the plaintiff, Corroon & Black-Rutters & Roberts, Inc. The court of appeals reversed and remanded for judgment notwithstanding the verdict, holding that the verdict was not supported by credible evidence and was contrary to public policy. We conclude that the information gleaned by the defendant from the plaintiff's files does not constitute a trade secret under Wisconsin law and, therefore, affirm the decision of the court of appeals.

Jack Hosch has been an agent licensed to sell insurance since 1958. In that year, he began his employment with the Roberts Company, a general insurance agency. In 1973, the business and assets of Roberts, including all of its insurance accounts, were acquired by Corroon & Black through an exchange of the stock of Roberts with the stock of Corroon & Black.

During his employment, Hosch was responsible for procuring and servicing insurance accounts for a large number of Corroon & Black's customers. Hosch himself brought about half of these accounts to Corroon & Black. Servicing an account involved, among other things, contacting a customer when the policy was about to expire and reviewing and updating the coverages before renewing the policy.

When the two agencies merged in 1973, Hosch and other employees of Roberts who joined Corroon & Black were required to sign a covenant not to compete. Hosch's covenant not to compete terminated on December 31, 1977. He entered into no other such agreement.

When the term of the covenant not to compete ended, Hosch left Corroon & Black to work for a competitor.

Shortly thereafter, in January of 1978, Corroon & Black's president learned that numerous agent-of-record letters had been issued in favor of Hosch and his new agency. These letters notified insurance companies that certain accounts were being switched to a different agency. This resulted in substantial losses of commissions for Corroon & Black, since approximately two-thirds of Hosch's Corroon & Black customers changed to his new agency.

It is clear that Hosch actively solicited his former Corroon & Black clients. That he utilized information gained during his employment with Corroon & Black is not in dispute. This information was of help to him in contacting former customers. Corroon & Black presented testimony that Hosch may have taken detailed information in the expiration lists. Such lists contain names and addresses of policyholders, key personnel to contact, renewal dates and amounts of coverage. Hosch disputes this.[1] While we recognize the dispute in the evidence on this issue, we can accept Corroon & Black's statement of facts on this point and still reach a conclusion adverse to them.

Corroon & Black's customer files were kept in filing cabinets, which were never locked. Expiration lists were kept in cabinets which were locked on rare occasions. There were approximately 75 employees, all of whom had access to these files.

Corroon & Black commenced an action against Hosch, alleging that Hosch had unlawfully used "privileged and confidential information in the nature of trade or business secrets" from Corroon & Black's files to solicit his former customers.

The complaint demanded compensatory damages in the amount of the commissions for the diverted accounts and further demanded punitive damages. Corroon & Black

---

[1] Hosch contends that he wrote a customer's name down when it came to mind; only then did he go to the customer files for the address and phone number.

also asked for an order enjoining any future solicitation by Hosch of his former Corroon & Black clients. The jury found that the files were confidential and that Hosch had made unauthorized use of them. It awarded Corroon & Black $50,000 compensatory damages and $4,000 punitive damages. The trial court approved the verdict.

Hosch appealed, contending that there was no trade secret involved. He also challenged the damages award. The court of appeals concluded that no liability existed because no trade secrets were involved. Therefore, the court did not address the damages issues.

The jury determined that it was unfair competition for Hosch, an insurance agent, to use customer lists of his former employer to divert clients to his new insurance agency. Corroon & Black emphasizes the unfairness of this situation and asserts that Hosch was untrustworthy. The plaintiff in *Gary Van Zeeland Talent, Inc. v. Sandas*, 84 Wis. 2d 202, 267 N.W.2d 242 (1978), made a similar argument. However, any perceived unfairness should not be the determining factor. As we stated in *Van Zeeland:*

"[S]o long as a departing employee takes with him no more than his experience and intellectual development that has ensued while being trained by another, and no trade secrets or processes are wrongfully appropriated, the law affords no recourse." *Id.* at 214.

We also feel compelled to point out that there was no covenant not to compete in effect when Hosch began working for a competitor of Corroon & Black.

Since the protection of a covenant not to compete is not available to Corroon & Black, the outcome in this case necessarily turns on the question of whether the information taken by Hosch was a trade secret.

At the outset, we must address Corroon & Black's contention that the jury's verdict was supported by credible evidence. The court of appeals properly characterized

the issue of whether a trade secret exists as a mixed question of law and fact. In *Department of Revenue v. Exxon Corp.*, 90 Wis. 2d 700, 281 N.W.2d 94 (1979), we stated that when a mixed question of law and fact is presented to this court, there are two component questions which must be answered. The first question is what, in fact, actually happened. The second question, whether those facts as a matter of law fulfill a particular legal standard, is a question of law. *Id.* at 713. Thus, we hold that whether the information taken by Hosch constitutes a trade secret is a question of law for the court.[2] This court need not give special deference to the determinations of the trial court on an issue of law. *Compton v. Shopko Stores, Inc.*, 93 Wis. 2d 613, 287 N.W.2d 720 (1980); *First Nat. Leasing Corp. v. Madison*, 81 Wis. 2d 205, 260 N.W.2d 251 (1977).

The conclusion that an insurance agency's customer list is not a trade secret is consistent with current Wisconsin law, as enunciated in our decisions in *Abbott Laboratories v. Norse Chemical Corp.*, 33 Wis. 2d 445, 147 N.W.2d 529 (1967), and *Gary Van Zeeland Talent, Inc. v. Sandas*, 84 Wis. 2d 202, 267 N.W.2d 242 (1978).

In *Abbott,* an employee took, among other things, a customer list for artificial sweeteners and used it to compete against his former employer. In the *Abbott* opinion, we noted that the law concerning trade secrecy features two basic themes. Some courts have emphasized the breach of confidence aspect of the law of unfair competition.[3] Usually, however, such cases also involve an

---

[2] We need not discuss whether the jury instructions correctly stated the law with regard to legal protection of customer lists, since we have concluded that this is a question of law which is not appropriate for determination by the jury.

[3] *See, e.g., Standard Brands, Inc. v. U.S. Partition & Packaging Corp.*, 199 F. Supp. 161 (D.C. Wis. 1961) and *Franke v. Wiltschek*, 209 F.2d 493 (2d Cir. 1953).

assumed trade secret. The second theme is the requirement of the existence of an actual trade secret as the *sine qua non* of a cause of action for unfair competition. The emphasis is on the nature of the ideas and concepts which employees take with them to their new jobs. 33 Wis. 2d at 455–56.

Corroon & Black's analysis in the instant case bears close resemblance to the first theory in trade secret law discussed in *Abbott*. As mentioned previously, Corroon & Black emphasizes the alleged confidentiality of its customer lists and apparently equates confidentiality of information with trade secret status. We find this to be an inaccurate statement of existing law. This court in *Abbott* adopted the Restatement view of the law of trade secrets, finding that it:

". . . gives proper balance to the two factors that have cropped up throughout the development of the law of trade secrets." *Id.* at 456.

In discussing the definition of a trade secret, we quoted with approval the following language from Restatement, 4 *Torts*, § 757, comment b (1939) :

"Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Id.* at 463–64.

Applying the Restatement definition, this court held that Abbott's customer list was not a trade secret, because it was not sufficiently secret or confidential and because it contained only the names and addresses of the

individual to be contacted, rather than complicated marketing data concerning the customer's projected market needs or the customer's market habits.

We also noted that customer lists are the periphery of the law of unfair competition.[4] This is because legal protection would not provide the incentive to compile such lists; most are developed in the normal course of business, anyway.[5]

This court applied the Restatement definition to a customer list in *Gary Van Zeeland Talent, Inc. v. Sandas,* 84 Wis. 2d 202, 267 N.W.2d 242 (1978), and reached a similar result. When the defendant, Sandas, left Van Zeeland, a talent booking agency, he made copies of Van Zeeland's customer list. Shortly thereafter, Sandas started his own talent agency. The trial judge concluded that the list did not constitute a trade secret and ordered summary judgment for the defendant. We affirmed the trial court.

The trial court in *Van Zeeland* determined that the list did not meet the Restatement definition of a trade secret. The list did not contain complicated marketing data; it merely included names of customers. Moreover, the list was reproducible by many persons.

We are not unmindful of the fact that the Corroon & Black list may have contained more detailed information than the "bare bones" customer lists in *Abbott* and *Van Zeeland.* However, we do not agree with Corroon & Black's contention that this should be a deciding factor. Even though it contains more than just names and addresses of customers, an insurance agency customer list,

[4] *See, Developments in the Law—Competitive Torts,* 77 Harv. L. Rev. 888, 955 (1964).

[5] Soon after the *Abbott* decision, this court applied its rule in *American Welding & Engineering Co. v. Luebke,* 37 Wis. 2d 697, 155 N.W.2d 576 (1968), and found that the customer list in question did not constitute a trade secret.

such as the one in this case, is not entitled to trade secret protection under Wisconsin law.

Corroon & Black contends that the six Restatement elements are not requirements for trade secret status, but rather are factors under which the defendant must show that a trade secret does not exist. It is argued that the expiration lists qualify as trade secrets under this interpretation of the Restatement definition.

We hold that an insurance agency expiration list does not meet the six-factor Restatement definition of a trade secret. Each of the six factors should indicate that a trade secret exists if the information is to be afforded legal protection.

Corroon & Black asserts that considerable time and money were expended in the development of the information on the expiration lists. In *Abbott* and *Van Zeeland,* we stated that the customer lists in those cases were "merely the outgrowth of normal marketing endeavors" and were "nothing unique or confidential that should be protected in order to prevent competition." *Van Zeeland,* 84 Wis. 2d at 217. The court of appeals below correctly determined that the time and money expended by Corroon & Black were spent on the development of the market which the customer list represents, rather than on the compilation of the information. Thus, the fourth and fifth elements of the Restatement definition are lacking. To afford protection to insurance agency customer lists, which are developed in the normal course of business anyway, would be contrary to public policy.

Corroon & Black's president testified that the files were, in his opinion, confidential. However, the evidence shows that most, if not all, of Corroon & Black's employees had access to this information. On this basis, the customer lists fail to meet the Restatement definition under the second and third elements.

Finally, there is some evidence which indicates that the information on many of the larger insurance clients could have been obtained by Hosch and others even without the customer lists.

Aside from the Restatement definition of a trade secret, this court also considered the route-nonroute distinction in *Abbott* and *Van Zeeland*. As we explained in *Abbott*, a nonroute customer is likely to purchase from several suppliers. Courts are less likely to afford protection against "unfair" competition by a former employee, because there is no particular relationship developed between a customer and a salesman (the employer) which is enduring. 33 Wis. 2d at 467. In *Van Zeeland* we pointed out that certain professionals, for example, dentists, doctors, attorneys and accountants, may be considered to be covered by the route sales rationale, even though they do not meet the traditional definition of "route salesman."[6]

Corroon & Black asserts that insurance agents are in the route salesman category. We disagree. To the extent that the route-nonroute rationale applies[7] in this situation, it appears that insurance agents are nonroute salesmen. It seems clear to us that many insurance customers do not depend on one agency for all of their insurance needs. Moreover, many persons change com-

---

[6] "The typical and classical case of a route customer is the relationship between a householder and a milk delivery salesman. In that situation, the householder, during the course of the relationship, typically buys exclusively from the particular salesman; and it is assumed that, therefore, a special personal relationship will develop which will continue even though the salesman should commence his own enterprise or switch employers." *Gary Van Zeeland Talent, Inc. v. Sandas*, 84 Wis. 2d 202, 215, 267 N.W.2d 242 (1978).

[7] Apparently the route-nonroute rationale is most often employed in cases where there is a covenant not to compete and the enforceability of the covenant is being questioned. *See, Trade Secrets, Customer Contacts and the Employer-Employee Relationship*, 37 Ind. L.J. 218, 230 (1961–62).

panies and agents quite frequently in order to save a few dollars in premium.

Finally, public policy reasons militate against affording trade secret status to insurance agency customer lists. As we pointed out in *Van Zeeland:*

"[C]ustomer lists are at the very periphery of the law of unfair competition, because legal protection does not provide incentives to compile lists, because they are developed in the normal course of business anyway." 84 Wis. 2d at 221–22.

We also noted:

"The enforcement of a concept that one may not use trade secrets can only be justified as an unusual exception to the common law policy against restraint of trade." *Id.* at 209.

This court stated in *Van Zeeland* that it was the public's right to have reasonable competition. Worker mobility should also be encouraged. Legal protection for customer lists works against these goals.

"[I]t is contrary to public policy to afford special protection to a restraint-of-trade mechanism where to do so does not give a special incentive for creativity that will inure to the benefit of the public at large." *Id.* at 217.

Therefore, we conclude that the insurance agency customer list in this case was not a trade secret and that the defendant should not be restrained from contacting the customers of the plaintiff.

*By the Court.*—The decision of the court of appeals is affirmed.

BEILFUSS, C.J., took no part.

SHIRLEY S. ABRAHAMSON, J. *(dissenting)*. I dissent because the majority has departed, without justification or explanation, from the well-accepted legal principles which this court has previously adopted in trade secret cases and because the majority has not given proper deference to the jury verdict.

## I.

In order to evaluate the majority's departure from precedent and the majority's new standard of appellate review of jury verdicts, I will set forth the factual dispute which the jury in this case was called upon to resolve and the jury instructions which provide the legal framework for the jury to use in deciding the issues presented to it.

Corroon & Black presented evidence that Hosch had unlawfully taken and used three types of information:

(1) "Customer lists," that is, lists containing names and addresses of 85 commercial and 113 personal customers that Corroon & Black had assigned to Hosch;

(2) "Expiration lists," that is, lists of the customer policies showing their expiration date; and

(3) Information contained in "insurance agency files," such as:

(a) names of key personnel to contact regarding particular insurance policies;

(b) type and amount of coverage under each policy;

(c) name of insurer providing each type of coverage;

(d) summaries of calls made to customers and information discussed during those calls;

(e) suggestions concerning information that might be discussed with the customer on the next call;

(f) memoranda regarding a customer's problems that would affect the customer's insurance coverage,

(g) the names of insurance companies with which Corroon & Black had placed the customer's insurance business;

(h) the premium charge for each policy;

(i) the commissions on the policies;

(j) the customer's claims history and loss experience;

(k) whether any other insurer had refused to write a particular type of policy for the customer;

(l) engineering surveys and information on structures insured;

(m) evaluations of the customer's business indicating potential for additional insurance.

Hosch acknowledged that he had access to all of this information when he worked for Corroon & Black and that the information had value to an insurance agent or agency because it gave the agent or agency a competitive advantage over others in the business. He denied that he took either the expiration lists or the information in the insurance agency files.

Hosch moved for a directed verdict on the ground that the evidence, as a matter of law, was insufficient to prove that Hosch made unauthorized use of trade secrets. The trial court denied the motion, finding that the disputed facts gave rise to a jury question.

The trial court then instructed the jury regarding its duties and the principles of law applicable to the case. The trial court instructed the jury with regard to the value of some particular types of information in issue here and to the use of six factors (sometimes referred to herein as the *Abbott*-Restatement factors) adopted by this court to guide the determination of whether particular information should be protected as a trade secret. The six factors are set forth in the instructions quoted in full below.

The trial court also instructed the jury that trade secret law will allow a former employee to "freely use

general knowledge, skills and experience acquired under his former employer," but that the employee "remains under a duty not to use to the detriment of his former employer, without authorization, confidential information acquired in the course of his previous employment." The jury was instructed as to the policy balance that trade secret law attempts to strike between employee mobility and employer business protection. Beyond the policy of balancing fairness to the employer and fairness to the employee, the trial court instructed the jury regarding the general policy of not protecting information that need not be protected because it is "generated in the ordinary course of a business, or . . . is merely the outgrowth of a company's normal marketing endeavors, and which is nothing unique or confidential. . . ."

The jury instructions relevant specifically to trade secrets are as follows:

"While a former employee may freely use general knowledge, skills and experience acquired under his former employer, he remains under a duty not to use to the detriment of his former employer, without authorization, confidential information acquired in the course of his previous employment.

" 'Expirations' or 'renewal rights' of an insurance agency is a valuable asset, and is frequently bought and sold between agents.

"In determining whether the customer files are confidential, you may consider:

"1. The extent to which the information contained in the files is known outside of plaintiff's business;

"2. The extent to which the information contained in the files is known by employees and others involved in plaintiff's business;

"3. The extent of measures taken by plaintiff to guard the confidentiality of the information;

"4. The value of the information to plaintiff and to his competitors;

"5. The amount of effort or money expended by plaintiff in developing the information; and

"6. The ease or difficulty with which the information could be properly acquired or duplicated by others.[1]

"The plaintiff must prove that:

"1. The information contained in the customer files was of a confidential nature.

"2. The defendant obtained or used the information improperly; and

"3. The defendant knew or should have known his action was improper.

"If you determine that the customer files were of a confidential nature, then in order to find for the plaintiff, you must determine whether the files were obtained or used improperly.

"One who discloses another's confidential information is liable to the other if his disclosure or use constitutes a breach of confidence reposed in him.

"To find a breach of a confidential relationship, you must first find that the recipient of the information knew or should have known the information was confidential. A relationship of confidence may be implied if the disclosure is made solely for the purpose of advancing or implementing an existing special relationship.

"An agent is entitled to use general information concerning the method of business of his former employer and the names of the customers retained in his memory, if such information is not acquired in violation of his duty as agent. Information of this sort is barred from use in competition with the employer to the extent that, considering all the circumstances, it would be unfair to the former employer for the agent to use it. In determining this, the desirability of permitting employees to be free to terminate the employment relation and to continue working in the same business, are factors to be considered.

"Material which is generated in the ordinary course of a business, or which is merely the outgrowth of a company's normal marketing endeavors, and which is nothing unique or confidential, is not afforded protection."

Neither party challenges the instructions on appeal. The trial court phrased the instructions in terms of "con-

---

[1] I refer to these six factors as the *Abbott*-Restatement factors.

fidential" information rather than "trade secrets." Although better instructions might be devised, the trial court correctly set forth the law of trade secrets which this court adopted in *Abbott Laboratories v. Norse Chemical Corporation,* 33 Wis. 2d 445, 456, 147 N.W.2d 259 (1967).[2] As the majority points out, *Abbott* adopted the statement of the law of trade secrets set forth in sec. 757 of the Restatement of Torts (1939), *supra* at 295, and this court has consistently followed the Restatement and the *Abbott* decision. *See American Welding & Engineering Co. v. Luebke,* 37 Wis. 2d 697, 701, 155 N.W.2d 576 (1968); *RTE Corp. v. Coatings, Inc.,* 84 Wis. 2d 105, 114–15, 267 N.W.2d 226 (1978); *Gary Van Zeeland Tal-*

---

[2] At oral argument but not in the briefs, counsel for Hosch argued that because the trial court instructed the jury in terms of "confidential information" rather than "trade secrets," and because the trial court at one point expressed some doubt about whether the evidence concerned "trade secrets," this court should construe the jury verdict as finding Hosch liable for taking confidential information rather than trade secrets. Hosch's argument is not persuasive. When the verdict questions are read with the jury instructions and case law discussing trade secrets, it is clear that the words "confidential information" were used as the equivalent of trade secrets. Although use of the two terms does not lead to clarity in the law, this court, other courts, and apparently the parties in this case have used the terms "trade secrets" and "confidential information" as synonymous. The two themes in trade secrecy law are breach of confidence and the confidential, that is, secret, nature of the material. *See* the *Abbott* case, *passim,* and *see also Standard Brands, Inc. v. Zumpe,* 152 P.Q. 731, 264 F. Supp. 254, 262 (E.D. Louisiana, 1967); *Holiday Food Co., Inc. v. Munroe,* 37 Conn. Supp. 546, 426 A.2d 814, 817 (1981); *ILG Industries, Inc. v. Scott,* 49 Ill. 2d 88, 273 N.E.2d 393, 396 (1971) reh'g denied; *Midwest Micro Media, Inc.,* 76 Ill. App. 3d 698, 32 Ill. D. 241, 395 N.E.2d 188, 192 (1979); *Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 282 N.E.2d 921, 925 (1972), on remand 361 Mass. 835, 282 N.E.2d 921, aff'd as modified on other grounds, 377 Mass. 159, 385 N.E.2d 1349 (1979); *Expo Chemical Co., Inc. v. Brooks,* 572 S.W.2d 8 (Tex. Civ. App. 1978).

*ent, Inc. v. Sandas,* 84 Wis. 2d 202, 208–11, 267 N.W.2d 242 (1978).[3]

The jury found, by special verdict, that the insurance files of Corroon & Black were of a confidential nature and that Hosch had made unauthorized use of the information in the insurance files.[4]

---

[3] For a discussion of the common law of trade secrets and the Wisconsin cases, *see* Zarwell, *The Trade Secret Case,* 31 Gavel No. 1, p. 6 (June 1970); Klitzke, *The Uniform Trade Secrets Act,* 64 Marq. L. Rev. 277 (1980).

For a bibliography of the literature on trade secrets, *see* 2 Callmann, *Unfair Competition, Trademarks and Monopolies,* sec. 14.01, pp. 14–4, 14–5 (4th ed. 1982).

Although the parties and the majority use the analysis of trade secrets appearing in the first Restatement of Torts, the American Law Institute deleted the section on trade secrets in the second Restatement of Torts. The Institute explains its deletion of the section as follows: "the influence of Tort law [in the field of trade regulation] has continued to decrease, so that it is now largely of historical interest and the law of Unfair Competition and Trade Regulation is no more dependent upon Tort law than it is on many other general fields of the law and upon broad statutory developments, particularly at the federal level." 4 Restatement, Second, Torts, p. 1 (1979).

Nevertheless I do not view the rule set forth in the Restatement as obsolete. Current thinking in the field is in harmony with the general principles set forth in the Restatement. The Wisconsin legislature's definition of trade secrets does not appear to differ drastically from the Restatement. The legislature has defined a trade secret for the purpose of protecting revelation of trade secret information by an administrative agency, secs. 227.09(7)(b), Stats. 1979–80, and in creating the crime of theft of trade secrets. Sec. 943.205(2)(a), Stats. 1979–80.

The Restatement's enunciation of generally accepted principles of trade secret law has, to a great extent, been codified by the Commissioners on Uniform State Laws in the Uniform Trade Secrets Act (1979). 14 U.L.A. 537, 538 (Master ed. 1980). The Wisconsin legislature has not adopted the Uniform Trade Secrets Act.

[4] The jury responded to four special verdict questions as follows:

*"Question No. 1*

On appeal, the court of appeals remanded the case to the trial court to enter a judgment notwithstanding the verdict, and the majority here has, to a great extent, adopted the reasoning of the court of appeals. The majority concludes that the trial court erred in failing to find, as a matter of law, that the information in issue does not constitute a trade secret.[5] In reaching its conclusion, the majority alters significantly the substantive law of trade secrets and undermines the established standard used to review jury verdicts.

## II.

The majority departs in two significant ways from this court's prior cases which analyze trade secrets. First, the majority fails to follow our prior case law

---

"Were the insurance files of the plaintiff, Corroon & Black, of a confidential nature?

ANSWER: Yes

"*Question No. 2*

"In the event you have answered Question No. 1, 'yes,' then answer this question:

"Did the defendant, Jack Hosch, make unauthorized use of information in the insurance files of the plaintiff, Corroon & Black?

ANSWER: Yes

"*Question No. 3*

"You must answer this question irrespective of previous answers.

"What sum of money, if any, will fairly and reasonably compensate the plaintiff, Corroon & Black, for damages?

ANSWER: $50,000.00

"*Question No. 4*

"Question No. 4 is to be answered only in the event that you have awarded damages in Question No. 3.

"What sum of money, if any, should be assessed against the defendant, Jack Hosch, as punitive damages?

ANSWER: $4,000.00"

[5] The majority states that it can accept Corroon & Black's characterization of the information and "still reach a conclusion adverse to them." *Supra* at p. 292.

which recognizes that a wide spectrum of information may be protected as a trade secret and that the decision to protect information as a trade secret in a particular case must be determined on the basis of the facts of the case. Second, the majority, contrary to this court's interpretation of the *Abbott*-Restatement test, holds that the information sought to be protected must fulfill each prong of the six-factor test. *Supra* at p. 297.

This court has consistently reviewed each trade secret case on its own facts, refusing to create "generic" categories of information which are or are not trade secrets. We have stated repeatedly that a court cannot determine whether the information is a trade secret in a factual vacuum. The court must make a "detailed analysis" of the facts. *Abbott, supra,* 33 Wis. 2d at 457; *RTE Corporation v. Coatings, Inc.,* 84 Wis. 2d 105, 116, 267 N.W. 2d 226 (1978) ; *Gary Van Zeeland Talent, Inc. v. Sandas,* 84 Wis. 2d 202, 206–207, 209, 212, 216, 223, 267 N.W.2d 242 (1977) ; *American Welding Engineering Co. v. Luebke,* 37 Wis. 2d 697, 702–703, 155 N.W.2d 576 (1968).

While this court has been reluctant to protect customer lists and has stated that customer lists are on the "periphery" of the law of unfair competition, *Abbott, supra,* 33 Wis. 2d at 467, *Van Zeeland, supra,* 84 Wis. 2d at 209, this court has also recognized that there may be circumstances under which customer lists are protected. *Van Zeeland, supra,* 84 Wis. 2d at 208, 222. We have not created a *per se* rule which eliminates customer lists from protection as a trade secret, because we have recognized that customer lists present "problems of extreme commercial importance and a close balancing of the interest of the employer and employee." *Van Zeeland, supra,* 84 Wis. 2d at 209, quoting from Alexander, *Commercial Torts,* sec. 3.34, p. 216 (1973). The *Van Zeeland Abbott,* and *American Welding* cases do not hold that customer lists can never be trade secrets. Those cases stand only for the proposition that under the circumstances de-

scribed in those cases the customer lists did not meet the legal standard of a trade secret.

Neither courts in other jurisdictions nor the Restatement have created a *per se* rule granting or denying customer lists protection as a trade secret. Courts in other jurisdictions analyze each customer list case on its own facts. In some cases customer lists and customer information have been protected and in others not.[6] The Restatement specifically includes customer lists in its discussion of the different types of trade secrets:

"A trade secret may consist of any formula, pattern, device or *compilation of information* which is used in one's business, and which gives him [or her] an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a *list of customers*. . . . It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management." 4 Restatement of Torts, sec. 757, comment b, p. 5 (1939) (emphasis supplied).

The majority here ignores the factual approach to trade secret cases by purporting to create a rule that, as a matter of law, certain customer information is not to be afforded protection as a trade secret. The majority

[6] *See, e.g., United Ins. Co. of America v. Dienno,* 148 P.Q. 149, 248 F. Supp. 553 (E.D. Pa. 1965); *ILG Industries, Inc. v. Scott,* 49 Ill. 2d 88, 273 N.E.2d 393, 396 (1971); *Revcor, Inc. v. Fame, Inc.,* 85 Ill. App. 2d 350, 228 N.E.2d 742 (1967); *Dozor Agency, Inc. v. Rosenberg,* 218 A.2d 583 (Pa. 1966); *Expo Chemical Co., Inc. v. Brooks,* 572 S.W.2d 8 (Tex. Civ. App. 1978).

For a collection of cases on the subject, *see* Annot. *Former Employee's Duty, in Absence of Express Contract, Not to Solicit Former Employer's Customers or Otherwise Use His Knowledge of Customer Lists Acquired in Earlier Employment,* 28 A.L.R. 3d 7 (1969).

simultaneously fails to specify the particular customer information that it will not protect. As noted earlier, the majority recognizes that the record reveals that Corroon & Black sought to protect three distinct types of customer information but uses the categories of information interchangeably. The majority refers to: "customer lists," *supra* pp. 291, 293, 294, 295, 296, 299; "expiration lists," *supra* pp. 292, 297; and "information gleaned . . . from the plaintiff's files." *Supra* p. 291. The majority states that this review presents a question concerning *"customer lists," supra* p. 291, but concludes, *supra* p. 291, that the *"information gleaned . . .* from the plaintiff's files does not constitute a trade secret"; it concludes that "an insurance agency's *customer list* is not a trade secret," *supra* p. 294, and holds that the *"expiration list"* is not protected because it does not meet the six-factor Restatement definition, *supra* p. 297; it analyzes the Restatement factors in terms of the *customer list* and the *files,* and then concludes that "[o]n this basis, the *customer lists* fail to meet the Restatement definition under the second and third elements." *Supra* p. 297. Finally, the majority determines that "public policy reasons militate against affording trade secret status to insurance agency *customer lists." Supra* p. 299. Because the majority is inattentive to the type of information it discusses, I do not know what type of information is no longer protected as a trade secret "as a matter of law." The majority's opinion can only serve to confuse the law of trade secrets and create uncertainty in the insurance industry which will not be able to tell what information this court will consider protectable.

The majority further errs in departing from prior case law by treating the *Abbott*-Restatement six-factor approach to trade secrets as a definition of a trade secret and by requiring each of the six *Abbott*-Restatement

factors to be satisfied before the information can be classified as a trade secret. *Supra* p. 297. Neither the Restatement nor *Abbott* defines "trade secrets" because, as the American Law Institute explains, "[a]n exact definition of a trade secret is not possible." In place of a definition, the Restatement lists "some factors to be considered in determining whether given information is one's trade secret. . . ." 4 Restatement of Torts, section 757, comment *b,* p. 6 (1939). The majority converts the six factors into a six-pronged test in which each prong is independent of the others. The majority gives each of the six factors much more importance than either the Restatement or this court intended to give them.

This court and other courts using the Restatement approach to trade secret law have never held that each of the six *Abbott*-Restatement factors must be "met" to establish a trade secret. The factors are "relevant," but not determinative. *Van Zeeland, supra,* 84 Wis. 2d at 211. The court need not accord the factors equal weight or consideration. *Holiday Food Co., Inc. v. Munroe,* 37 Conn. Supp. 546, 426 A.2d 814, 817 (1981).

One reason why the Restatement, this court, and other courts have not treated the six factors as independent tests is that the factors are a part of the overall policy balance that the decision maker must make and the fact that one factor is or is not met does not necessarily resolve the policy balance.

Perhaps in an attempt to reconcile the public policy aspects of trade secret law with its new use of the *Abbott*-Restatement factors as a test, the majority recognizes the role of public policy in trade secret cases, delineates the two overriding policy considerations (which were included in the instructions to the jury in this case), and then creates black-letter rules regarding the use of those policies.

The first policy consideration is that the law should not and will not protect information if protecting the information would serve no useful economic or social purpose and might unnecessarily inhibit competition. Thus, this court has held that a customer list which is "merely the outgrowth" of normal marketing endeavors *and* is "nothing unique or confidential" should not be protected. *Van Zeeland, supra,* 84 Wis. 2d at 217; *Abbott, supra,* 33 Wis. 2d at 468.

The second policy consideration involves balancing the interests of the employer and the employee. Employers have an interest in protecting information which they have spent a great amount of time and effort gathering and which gives them a competitive advantage over other businesses. Employees have an interest in not protecting information because of their concern that protecting the information will limit their ability to find employment in the field in which they may have developed expertise. Employees should, upon termination of employment, be able in their new employment to draw upon their general knowledge, experience and skill, however acquired.

The majority appears to place this trade secret case within the first policy construct by holding that "to afford protection to insurance agency customer lists, which are developed in the normal course of business anyway, would be contrary to public policy." *Supra* p. 297. The majority misapplies this policy by apparently holding that all information developed in the ordinary course of business is "merely the outgrowth of normal marketing endeavors" and is "nothing unique or confidential,"[7] and is therefore not protectable.

---

[7] The majority does not discuss novelty and uniqueness. It is clear from the Restatement and the cases that the same level of novelty, uniqueness, and invention is not required in trade secret law as in the law of patents. *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 481–82 (1974). Novelty or uniqueness in the trade secret

Just as the majority's transformation of the *Abbott*-Restatement factors into flat rules conflicts with this court's prior case law, the majority's categorical denial of protection for information generated in the normal course of business regardless of the nature of the information is contrary to the *Abbott*-Restatement formulation of trade secret law and contravenes the public policy of this state as defined by the Wisconsin legislature.

The *Abbott*-Restatement formulation of trade secrets does not categorically deny trade secrets protection to information generated in the normal course of business. The Restatement describes a trade secret as "any formula, pattern, device or *compilation of information* which is *used in one's business* and which gives him [or her] an opportunity to obtain an advantage over competitors who do not know or use it." (*Id.* at p. 5, emphasis added) In addition, the six factors all relate to business information. 4 Restatement of Torts, sec. 757, comment *b*, p. 6 (1939). Since business information and information used in business are often generated in the normal course of business, I do not construe either *Abbott* or the Restatement as precluding protection for information generated in the normal course of business.

Similarly, the Wisconsin legislature's definition of a "trade secret" includes business information used or for use in business. The legislature does not exclude from the definition of "trade secret" information generated in the normal course of business. Sec. 943.205, Stats. 1979–80, which applies to both civil and criminal cases, defines trade secret as follows:

" 'Trade secret' means the whole or any portion or phase of any scientific, technical, laboratory, experimental, development or manufacturing information, equip-

cases is used in the sense that the information is not known to others and is of value, importance, and benefit to a business which can conceal the information from others.

ment, tooling, machinery, design, process, procedure, formula or improvement, or *any business information used or for use in the conduct of a business,* which is manifestly intended by the owner not to be available to anyone other than the owner or persons having access thereto with the owner's consent and which accords or may accord the owner a competitive advantage over other persons." Sec. 943.205(2)(a), Stats. 1979–80 (emphasis added).

If the legislature authorizes punishment as a felony for the theft of information which might have been generated in the ordinary course of business, the majority's enunciation of public policy should not preclude civil protection of information generated in the ordinary course of business.

Just as the majority considers and misapplies this court's and the Restatement's policy of not protecting information that is "merely the outgrowth" of normal marketing endeavors, the majority considers and misapplies the second policy balance creating the framework of trade secret law, that of allowing employees job mobility while protecting employers from use of confidential information by former employees. In certain cases protecting customer information will be too great a restriction on the employee and will give the employer unjustified protection. *See, e.g.,* the *Van Zeeland* case. However, this court's refusal to protect customer information in some cases should not determine the result of all cases since the decision maker could reach a different policy equilibrium in each case.

The evidence in this case did not necessitate the majority's conclusion that the protection of Hosch's mobility outweighs the protection of Corroon & Black's business. There was no evidence that protecting Corroon & Black's information would have had any impact at all on Hosch's employability in another insurance agency. There was much evidence that eliminating trade secret protection

for this information resulted in Corroon & Black's loss of the competitive advantage it had built up through its efforts. The jury made this balance, and the majority opinion gives no adequate explanation for the court's substitution of its conclusion for the jury's.

## III.

The majority changes the standard of review of jury verdicts. Instead of using the established standard of review, which calls for deference to the jury verdict, the majority substitutes its conclusion for the jury's after analogizing the jury's determination in this case to an administrative agency's determination of a mixed question of law and fact. Using an "analytical approach," the majority sets forth two standards for appellate review of the jury verdict: (1) appellate review of the jury's determination of "what happened" is review of the question of fact and the jury's determination will be sustained if supported by credible evidence, and (2) appellate review of the jury's determination of whether "what happened" fulfills the legal standard is review of a question of law and this court need not defer to the jury's determination.[8]

The majority's approach to the standard of review in this case differs from this court's approach in other cases in which an appellate court reviews jury verdicts which involve mixed questions of fact and law. Juries often determine mixed questions of fact and law. Some of these determinations include whether particular conduct constitutes negligence, diligence, unreasonable delay and so forth. *Gammon v. Abrams,* 53 Wis. 323, 326, 10 N.W. 479

---

[8] For a discussion of Wisconsin's use of the analytical and practical approaches in reviewing administrative agencies' decisions of mixed questions of fact and law, see Hewitt, *The Scope of Judicial Review of Administrative Agency Decisions in Wisconsin,* 1973 Wis. L. Rev. 554.

(1881).[9] Just as the jury here determined "what happened" and whether "what happened" fulfills a legal standard, the jury that determines whether a defendant failed to exercise the degree of care which the ordinarily prudent person exercises under like or similar circumstances answers two questions: (1) what did the defendant do; and (2) does the conduct fulfill the legal standard (or, in other words, what are the legal consequences of the conduct). Morris, *Law and Fact*, 55 Harv. L. Rev. 1303, 1312 (1942).

The usual standard of review used to review the jury's determination of a mixed question of fact and law, *e.g.*, negligence, is the same standard used to review any jury determination.[10] The reviewing court must view the evidence in the light most favorable to the verdict and must affirm the jury verdict if there is any credible evidence on which the jury could have based its decision, particularly where (as here) the verdict has the approval of the trial court. Sec. 805.14(1), Stats. 1979–80; *Priske v. Gen-*

[9] In *Gammon v. Abrams*, 53 Wis. 323, 326, 10 N.W. 479 (1881), we discussed the jury's determination of mixed question of law and fact and deferred to the jury in making the decision:

"What is a reasonable time, unreasonable delay, laches, negligence or diligence, in any given case, is strictly a mixed question of law and fact, which ought to be submitted to the jury. But to this general rule there are two exceptions: (1) When there are fixed and certain rules for its determination by the court; and (2) where the uncontroverted evidence so clearly proves the issue that there is really no question in respect to it to be submitted to the jury. In such cases the question may be treated as one of law, and passed upon by the court without any encroachment upon the province of the jury."

[10] As Professor Davis explains, "[t]he question whether on undisputed facts the defendant was negligent is analytically a question of law but it is commonly called a question of fact because it is given to the jury whenever the applicable law is that a jury should be permitted to decide it either way." 4 Davis, *Administrative Law Treatise*, sec. 30.02, p. 198 (1958).

*eral Motors Corp.,* 89 Wis. 2d 642, 652, 279 N.W.2d 227 (1979) ; *Roach v. Keane,* 73 Wis. 2d 524, 536, 243 N.W.2d 508 (1976) ; *Thoe v. Chicago, Milwaukee & St. Paul Railway Co.,* 181 Wis. 456, 460, 195 N.W. 407 (1923). The reviewing court must search for credible evidence that will sustain the verdict and not for evidence to sustain a verdict the jury could have but did not reach. *Meurer v. ITT General Controls,* 90 Wis. 2d 438, 450–51, 280 N.W.2d 156 (1979).

The corollary to this statement of the "credible evidence test" is that the court need not defer to the jury when as a matter of law the jury could reach only one conclusion based on the evidence before it and the jury reached another conclusion. *Nolden v. Mutual Benefit Life Ins. Co.,* 80 Wis. 2d 353, 359, 259 N.W.2d 75 (1977) ; *Tombal v. Farmers Ins. Exchange,* 62 Wis. 2d 64, 68, 214 N.W.2d 291 (1974). Had the majority used the established standard of review it would have sustained the jury's verdict, since reasonable minds might differ on the outcome of this case.

Rather than engaging in the sort of factual analysis required by the "credible evidence" standard of review, the majority interprets the jury verdict to mean that the jury accepted Corroon & Black's version of what happened, that is, that Hosch took and used the information that Corroon & Black asserted he took. The majority does not even purport to review the record but assumes that there is credible evidence to support this jury finding. When the majority turns to the question of whether the facts satisfy the legal standard, the majority totally usurps this aspect of the jury's function by characterizing the issue as wholly a matter of law. The majority provides no rationale for this departure from established standards of appellate review of a jury verdict and I can find none.[11]

---

[11] There are, of course, similarities between the jury and the administrative agency, but there are important differences. Our

The majority treats the difference between fact and law as if that difference were clear cut and beyond dispute. There is, however, no single simple formula to distinguish between the two labels. To determine whether the issue should be labeled as a question of fact or law, one must ask why the distinction is being made and what are the consequences which flow from the distinction.[12] In appellate review the standard of review is a critical issue since here, as in other cases, the standard of review may, in effect, determine the ultimate decision in the case. If the appellate court's standard of review allows for deference to the jury verdict, the chances are high that the appellate court will affirm the judgment based on the verdict. If the appellate court's standard of review allows for no or little deference to the jury's verdict, the appellant's chances of overturning the jury verdict increase.

law treats administrative agency decisions and jury verdicts differently. The legislature requires the administrative agency to make separate findings of fact and conclusions of law, sec. 227.10, Stats. 1979–80, and provides that a reviewing court shall separately treat disputed agency interpretations of law and determinations of fact, sec. 227.20(3), Stats. 1979–80, and shall set aside agency action if the agency erroneously interpreted a provision of law, sec. 227.20(5), Stats. 1979–80, or if the agency's finding of fact is not supported by substantial evidence in the record, sec. 227.20(6), Stats. 1979–80. The jury is not required to separate its findings of fact and conclusions of law and the standard of review of jury verdicts by the trial court does not distinguish between questions of fact and law. *See* sec. 805.14(1), Stats. 1979–80.

[12] *See United States v. J.B. Williams Co., Inc.,* 498 F.2d 414, 431 (2d Cir. 1974); *Artvale, Inc. v. Rugby Fabrics Corp.,* 363 F.2d 1002, 1005 (2d Cir. 1966); 4 Davis, *Administrative Law Treatise,* secs. 30.01, 30.02 (1958); Carrington, *The Power of District Judges and the Responsibility of Courts of Appeals,* 3 Ga. L. Rev. 507 (1969); Clark and Stone, *Review of Findings of Fact,* 4 U. Chi. L. Rev. 190 (1936–37); Fox, *Law and Fact,* 12 Harv. L. Rev. 545, 551 (1898–99); Wright, *The Doubtful Omniscience of Appellate Courts,* 41 Minn. L. Rev. 751 (1956).

For purposes of appellate review, labeling a question as one of law allows the reviewing court to substitute its judgment for that of the trial court or jury and increases the power of the appellate court over juries and trial courts. If this court increases the power of the appellate courts to second-guess trial judges and juries, more and more cases will be appealed, burdening an already over-burdened court of appeals. An increased number of appeals means increased expense for litigants and the public. Unnecessarily broadening the scope of appellate review of trial judges and juries also impairs the confidence of litigants and the public in the decisions of juries and trial courts. Wright, *The Doubtful Omniscience of Appellate Courts,* 41 Minn. L. Rev. 751, 757–82 (1956).

The issue I must then address is whether better justice could be obtained by broadening the scope of appellate review in trade secrets cases. If so, then expense, delay, and court congestion caused by increased appeals may be the necessary price to pay for justice.

One could argue that better justice results when the appellate court, rather than the jury, determines whether information is a trade secret based on the appellate judge's greater expertise in legal matters and the desire for uniformity of decisions. I conclude, however, that better justice does not result when the reviewing court rather than the jury decides in doubtful cases whether the information is a trade secret because the appellate court has no greater expertise than the jury in balancing the values that underlie each trade secret case and because there is little likelihood of achieving any significant uniformity of decisions and any uniformity would be achieved at substantial cost.

The decision to protect certain information as a trade secret is the kind of decision best left to the jury under guidelines set forth by the court. Cases involving trade secret determinations, like cases involving negligence de-

terminations, call upon the trier of fact to place facts within a general construct of community values, not simply to determine what is the law. In negligence cases, for example, this construct is termed the "reasonably prudent person" standard: the jury must determine, according to community values, what a reasonably prudent person would do in a given situation. In trade secrets cases, the construct is one of fairness since the law developed as an attempt to enforce community morality in business dealings. 2 Callmann, *Unfair Competition, Trademarks and Monopolies,* sec. 14.20, 14.23 (4th ed. 1982). In both negligence and trade secrets cases, this court has established guidelines, given to the jury in the form of instructions, to help the juries apply the community's values to the facts in issue. I cannot conclude that appellate judges are more competent or more appropriate persons to make those value determinations in a factual context than juries. Our justice system dictates otherwise. In our justice system the jury, rather than the appellate court, ordinarily is viewed as providing the community's values. Indeed, litigants might raise federal and state constitutional objections to this court's substitution of judicial "wisdom" for the right to a jury trial. Therefore I see no reason to label the question one of law and take the case from the jury.

I also see no reason to take the case from the jury to create uniformity in the case law of trade secrets. I recognize that when trial courts and juries decide trade secret cases, different juries and trial courts might reach different results in similar cases. Uniformity is important to litigants and to the system. If an appellate court is empowered to substitute its judgment in each factual situation involving a trade secret for that of the jury or trial court it is possible that there may be more uniformity of result, but in cases such as trade secrets (or negligence) where a factual inquiry predominates the decision-

making process, the reviewing court is poorly equipped to make the decision because it is not as familiar with the case as the trial court and the chance that significant uniformity will result is not high. In such cases the appellate court is best equipped not to make the decision but to set forth guidelines, that is, the rules of law, and to ensure that the jury and trial court in making the decision apply the proper guidelines by review under the credible evidence test.

Beyond my disagreement with the majority's use of the new standard, I dissent from the majority's view that the administrative law standard of review always means that the reviewing court need not defer to the administrative agency's determination of the mixed question of fact and law. The majority's interpretation of the standard of review is erroneous. This court, using the practical approach, see note 8 *supra*, often defers to administrative agency determinations of mixed questions of fact and law when the administrative agency has a particular expertise in applying facts to the particular laws in issue. We have recognized that when the expertise of the administrative agency is significant to the determination of a legal question, the agency's decision, although not controlling, is given weight. *Milwaukee Co. v. ILHR Dept.,* 48 Wis. 2d 392, 399, 180 N.W.2d 513 (1970). When the agency's determination of the mixed question of fact and law calls for a value judgment, this court decides in each type of case the extent to which it should substitute its evaluation for that of the administrative agency. *Dept. of Revenue v. Smith Harvestore Products,* 72 Wis. 2d 60, 66, 240 N.W.2d 357 (1976). In several cases where the agency's determination represented a reasonable formulation and application of the statute, this court has deferred to the agency's determination irrespective of whether there may have been some other reasonable interpretation or application. *Dairy Equipment Co. v. DILHR,* 95 Wis. 2d 319,

327, 290 N.W.2d 330 (1980) ; *Nottleson v. DILHR*, 94 Wis. 2d 106, 116–17, 287 N.W.2d 763 (1980) ; *Gelencser v. Industrial Comm.*, 31 Wis. 2d 62, 69, 141 N.W.2d 898 (1966) (concurring opinion and cases cited therein).

In the case at bar, the determination whether the information is a trade secret involves a value judgment, an understanding of the community's values, and a resolution of competing social and economic policies. In our justice system the jury ordinarily is viewed as providing the community's values. Accordingly if I were to apply the administrative agency standard of review in this case, I would conclude that I should defer to the jury's expertise as to community's values and social policies; I would not substitute my judgment for the jury's.

In summary, I do not join the majority opinion because the majority, without explanation or justification, has substituted its wisdom for that of the jury and has departed from our prior decisions on trade secrets. Viewing the record favorably to Corroon & Black, I conclude that reasonable persons might differ as to whether the information Hosch took falls within the legal criteria of a trade secret. In such a case, under the established standard of review of a jury verdict, the judgment based on the verdict must be affirmed.[13] I would affirm the judg-

---

[13] There is credible evidence to support the jury's determination that the information at issue here was protectable as a trade secret.

The first factor is "the extent to which the information is known outside of his [or her] business." The majority does not discuss this factor. There is evidence in the record that the insurance file information is not normally made available to other insurance agencies, that the policy expiration dates are not duplicated in the files of other agencies. The majority notes that there is "some evidence which indicates that the information on many of the larger insurance clients could have been obtained by Hosch and others even without the customer lists." (*Supra* at 298) The majority does not cite this evidence. There was testimony that a few (approximately 10 out of Hosch's 198 customers) of the customers

ment of the circuit court and reverse the decision of the court of appeals.

were public corporations that took competitive bids an insurance policies and that the insurance information was necessarily disclosed in those bids. The jury could have weighed the evidence on both sides and determined that the fact that information regarding 10 companies might have been public was not sufficient to defeat trade secrecy protection in this case.

The second factor to consider is "the extent to which [information] is known by employees and others involved in his [or her] business." The majority apparently views the fact that Corroon & Black's employees had access to the information as defeating trade secrecy protection. I think that the jury could have found otherwise. The employees who had access to the information needed access to this information to do their jobs or were employed to keep the information in order. Other courts, considering similar issues, have concluded that limited disclosure to employees does not defeat trade secrecy protection. For example, in *Revcor, Inc. v. Fame, Inc.*, 85 Ill. App. 2d 350, 228 N.E.2d 742 (1967), the court concluded that the fact that Revcor disclosed information to employees did not defeat its trade secrecy status because the information was "not something held out for public domain but [was] treated, rather, as confidential information by Revcor. . . . The results of Revcor's labor . . . were kept confidential, except for their disclosure to the defendants who needed access to this information in order to design the requested tools. . . ." *Id.* at 745. The jury could have concluded that disclosure to the employees did not open the information to the public.

The third factor is the "extent of measures taken by him [or her] to guard the secrecy of the information." The majority states that the fact that the employees had access to all the information determines this factor. There is evidence in the record that Corroon & Black did take steps to guard the secrecy of the information. The records were kept in files that could be locked, although they seldom were; the expiration dates were kept in files that were locked at night; the building had daytime security protection to ensure that unauthorized persons did not have access to the building; there was no free access by employees to accounting files, in which there was certain information duplicated in the agency files.

Fourth, the jury considered the "value of the information to him [or her] and to his [or her] competitors." The evidence is undisputed that the totality of the information in issue here had great

value in the insurance business. Insurance agencies buy and sell this kind of information as part of the "goodwill" of the company. Therefore, even if the information is "not unique" as the majority states (but does not explain, *supra* at 297) that "fact" does not address the issue here, which is the value attached to the information.

The jury considered, fifth, "the amount of effort or money expended by him [or her] in developing the information." The majority, quoting from *Abbott* and *Van Zeeland,* appears to find that "customer lists in those cases were 'merely the outgrowth of normal marketing endeavors' and were 'nothing unique or confidential that should be protected in order to prevent competition.' *Van Zeeland,* 84 Wis. 2d, at 217." (*Supra* at 297) It then determines that whatever time and money were spent on compiling the information in *this* case represents the development of the market rather than compiling information. The majority cites no evidence for this proposition. The jury, viewing the evidence before it, could have found otherwise. Much of the information consisted of information about particular clients' needs, information the jury could have determined was necessary to serve a client, not develop a market. The information in *Abbott,* on the other hand, was necessary to develop a market for a new product; in *Van Zeeland,* the information was a Christmas card list that could have been used for promotional purposes, another marketing endeavor.

Finally, the jury was to consider "the ease or difficulty with which the information could be properly acquired or duplicated by others." The majority does not discuss this factor. There is evidence that although some of the information could have been obtained in ways other than using the insurance files, compiling all the information would have been difficult and time-consuming. In the case at bar, the jury could have concluded that the combination of names, addresses, policy types and coverages, expiration dates, engineering surveys and other particular information was unique, it was not readily available, and that the holder of the information has a competitive advantage over someone who just knew particular pieces of the information.

The jury could have considered all the evidence in light of the six *Abbott*-Restatement factors and the two policy considerations and determined that the information was protectable as a trade secret.